United States Court of Appeals
Fifth Circuit

**F I L E D**

July 11, 2005

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 04-70036

JULIUS JEROME MURPHY,

Petitioner-Appellant,

versus

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
For the Eastern District of Texas

Before GARZA, DeMOSS, and CLEMENT, Circuit Judges.

DeMOSS, Circuit Judge:

Petitioner-Appellant Julius Jerome Murphy ("Murphy") was convicted of capital murder in Texas and sentenced to death. Murphy filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Texas pursuant to 28 U.S.C. § 2254. The district court granted summary judgment to Respondent-Appellee Doug Dretke (the "Director"), in his role as Director of the Texas Department of Criminal Justice, Correctional Institutions Division, on seven of Murphy's eight claims. The court denied Murphy's petition on the one remaining *Batson v. Kentucky*, 476 U.S. 79 (1986), equal protection claim but granted Murphy a certificate of appealability ("COA") on that issue. For

the following reasons, we AFFIRM the district court's decision to deny relief.

## BACKGROUND

In August 1998 Murphy was convicted and sentenced to death for the capital offense of murdering Jason Erie during the commission of a robbery. The Texas Court of Criminal Appeals ("TCCA") summarized the facts presented during the guilt phase of Murphy's trial as follows:

> As the State's evidence demonstrated, [Murphy] was in a car riding with friends around Texarkana during the early morning hours of September 19, 1997. There had been heavy consumption of alcohol and marijuana throughout the previous day. The group passed an individual who appeared to be having car trouble and who had attempted to elicit their help. At the suggestion of a friend, [Murphy] agreed to drive back with an aim to "jack" or rob the stranded driver. After returning to the stranded motorist, [Murphy] and his friends helped jump-start the broken-down vehicle. The driver, Jason Erie, provided a small reward to [Murphy] and his friends for their help and returned to his car. [Murphy] then stepped from his vehicle, and, armed with a gun, demanded Erie's wallet. Initially, Erie protested and refused to hand over his property. As he finally began to comply, [Murphy] fired a single shot from close range into the victim's forehead and retrieved the stolen wallet from the spot it had fallen. It was later discovered along a nearby road where [Murphy] told investigators it had been discarded. Erie was alive when rescue workers arrived, but died a short time later.

> [Murphy] and his friends fled through Arkansas, to Tennessee, and finally ended up in Arlington, Texas, where they were apprehended by police. [Murphy's] girlfriend, Christina Davis, who was with [Murphy] throughout the duration of these events, testified that she had fought with [Murphy] on the day prior to the murder in which he struck her several times. She also explained to the jury how she and [Murphy] had fought the day they were arrested and how [Murphy] continued to hit her and threatened to shoot her in the leg to keep her from leaving.

*Murphy v. State*, No. 73,194, slip op. at 2-3 (Tex. Crim. App. May 24, 2000) (unpublished). Murphy, an African American, was convicted and sentenced by an all-Caucasian jury. Of the six potential African-American jurors who were questioned for *voir dire*, five were peremptorily struck by the Bowie County District Attorney (the "State"). One was accepted by the State but peremptorily struck by the defense. The defense objected to the State's striking of the African-American venirepersons; the trial court held a **Batson** hearing. Although the trial court ruled that Murphy had failed to make a *prima facie* showing of discrimination as to his **Batson** objections, it nonetheless required the State to offer reasons for the exercise of its challenges. Alternatively, the trial court ruled that the State's reasons were valid and race-neutral. The trial court thus overruled Murphy's **Batson** objections.

On direct appeal, the TCCA affirmed Murphy's conviction and sentence; Murphy did not seek certiorari review in the Supreme Court of the United States. Murphy filed a state application for writ of habeas corpus in the trial court in October 2000.[1] The trial court subsequently entered findings of fact and conclusions of law recommending Murphy's application be denied. In April 2002

---

[1]We note that Murphy argued his **Batson** claim on direct appeal, but not on state habeas. To meet exhaustion under § 2254(b)(1)(A), a petitioner must present his claim to the highest state court. *See* **Martinez v. Johnson**, 255 F.3d 229, 238-39 (5th Cir. 2001). On his direct appeal, Murphy only discussed three of the five African-American venirepersons peremptorily struck by the State – Bobbie Gladney ("Gladney"), Deliyamekia Johnson ("Johnson"), and Donna Cellers ("Cellers"). Although the magistrate judge and the district court used, and the parties frequently use, the spelling "Cellars," the state court record indicates that this venireperson's name is spelled "Cellers." We use "Cellers."

3

the TCCA adopted the trial court's findings and conclusions and denied Murphy habeas corpus relief.

In February 2003 Murphy filed the instant petition for writ of habeas corpus in district court.  In June 2003 the Director moved for summary judgment.  An evidentiary hearing took place before the magistrate judge ("MJ") in June 2004 on whether the state court's determination that the trial court did not abuse its discretion in finding that the reasons offered by the prosecution for peremptorily challenging African-American jurors were race-neutral was unreasonable.  The Director presented the original prosecutor, Al Smith ("A. Smith"), as a witness; Murphy presented trial counsel, Craig Henry ("Henry"), as a witness.  The MJ then filed her report and recommendations, recommending that the court grant the Director summary judgment as to all of Murphy's eight claims.[2]  Murphy timely filed objections.  After *de novo* review of the MJ's

---

[2]On federal habeas, Murphy asserted his **Batson** claim as to all five African-American venirepersons struck by the State, also including Greaker Robinson ("Robinson") and Jimmy Brewer ("Brewer").  While the Director argued that Murphy's claims were unexhausted as to these two venirepersons, the MJ addressed all five struck venirepersons; and the district court stated it believed considering the entire record as to all five was appropriate when deciding whether the trial court's determination that the State used its peremptory challenges in a nondiscriminatory manner was reasonable.  The Director has not reasserted lack of exhaustion on appeal, and Murphy tightly focuses his arguments here on the striking of Gladney and Cellers.  With that in mind, we simply note that we, like the MJ and the district court, do not limit our consideration of the record, in order to better determine reasonableness of the state court's decision to overrule Murphy's **Batson** objection.  *But see, e.g.,* **Tigner v. Cockrell**, 264 F.3d 521, 526 & n.3 (5th Cir. 2001) (choosing instead to *sua sponte* refuse to consider the constitutional portion of the petitioner's challenge to admitted expert testimony, even though the district court had considered the argument).

4

report and recommendations, in August 2004 the district court agreed with the summary judgment recommendation as to seven of Murphy's eight claims but did not accept such recommendation as to the **Batson** claim on which the MJ had held the evidentiary hearing.

Instead, the district court accepted the MJ's findings on that **Batson** claim and denied relief. The district court thus agreed with the MJ's determination that the differences in the questions asked of African-American versus non-African-American venirepersons during *voir dire* could be explained by reasons other than a desire to exclude potential jurors because of their race; that non-African-American venireperson Ladonna Smith ("L. Smith") was not similarly situated to African-American venireperson Cellers because the evidence showed Cellers had been convicted of a felony while L. Smith had only been arrested for an unknown nonfelony offense; and that the state court's rejection of the **Batson** claim because L. Smith and Cellers were not similarly situated was not unreasonable because the evidence did not show L. Smith had ever been convicted and her lone arrest was 20 years prior to Murphy's trial. Murphy filed a notice of appeal from the district court's judgment. In September 2004 the district court denied Murphy a COA as to the seven issues it granted the Director summary judgment, but it agreed to issue a COA as to Murphy's **Batson** claim.

## DISCUSSION

Murphy filed his Section 2254 petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). In a habeas corpus appeal, this Court reviews the district court's findings of fact for clear error and its conclusions of law *de novo*, applying the same standards to the state court's decision as did the district court.

5

*Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004) (citation omitted).

Under AEDPA, this Court may not grant relief on a claim the state court has adjudicated on the merits "unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) & (2).  "A state court's decision is deemed 'contrary to' clearly established federal law if it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts."  *Busby*, 359 F.3d at 713 (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  "A state court's decision constitutes an unreasonable application of clearly established federal law if it is objectively unreasonable."  *Pondexter v. Dretke*, 346 F.3d 142, 146 (5th Cir. 2003) (citing *Williams*, 529 U.S. at 409).  "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous."  *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  We presume the state court's findings of fact are correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

**Whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law.**

*Batson* introduced a three-step evidentiary framework for

evaluating claims of racial discrimination in jury selection. 476 U.S. at 96-98. First, the defendant must make a *prima facie* showing that the State has exercised peremptory challenges on the basis of race. *Id.* at 93-94, 96-97. Second, if the requisite showing is made, the burden shifts to the State to produce a race-neutral explanation for striking the venireperson at issue and thus rebut the defendant's *prima facie* case. *Id.* at 94, 97-98. "Unless a discriminatory intent is inherent in the [State]'s explanation, the reason offered will be deemed race neutral." **Hernandez v. New York**, 500 U.S. 352, 360 (1991). Finally, under the third step, the trial court must determine whether the defendant has carried his ultimate burden of proving purposeful discrimination. **Batson**, 476 U.S. at 94 & n.18, 98. A state trial court's finding of the absence of discriminatory intent is "a pure issue of fact" that is accorded great deference and will not be overturned unless clearly erroneous. **Hernandez**, 500 U.S. at 364-65. Our role on appeal is to "determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary." **Miller-El v. Cockrell**, 537 U.S. 322, 341 (2003).

The findings and conclusions of the trial court and adopted by the TCCA relevant to the instant **Batson** issue include the following:

> [Murphy] . . . argues those reasons relied on by the State to exercise its peremptory challenges against minority venire members were, in fact, pretextual in nature and were used to mask discriminatory intent. The three struck venire members of whom [Murphy] complains on this appeal are set out as follows accompanied by the reasons prosecutors felt a peremptory challenge was appropriate and what attempts were made by defense counsel to show the reasons were pretextual:

7

(1) Venire member Gladney – Prosecutors felt he was predisposed to not impose the death penalty, which he felt was used too often. Gladney indicated he believed there should be "a medicine to change people who commit these kinds of crimes." He expressed a belief that there would have to be no doubt in his mind before deciding the death penalty was appropriate. He had children the same age as [Murphy, who was 19 at the time of his trial]. He showed up for voir dire wearing a t-shirt and chewing gum, indicating, to prosecutors, a lack of respect for or recognition of, authority. Venire member Gladney also felt that Karla Faye Tucker (a recent prisoner of death row) should not have been executed, that the term "society" did not include prison, and that a person became less violent with age. Finally, prosecutors say they exercised a strike because of venire member Gladney's beliefs concerning law enforcement and the criminal justice system.

In response, the defense attempted to engage in a comparative analysis to demonstrate that white venire members were not struck despite the fact they, too, were chewing gum or expressed a belief that there must be no doubt before a punishment of death is imposed. Additionally, counsel for [Murphy] attempted to demonstrate that the State engaged in disparate questioning of minority and Caucasian venire members in order to unfairly exclude those minority members.

(2) Venire member Johnson – She expressed an ongoing concern that jury service would unduly interfere with her attempts to attend nursing school. Also, she had originally indicated on the juror questionnaire that, while the death penalty may be appropriate in some cases, she could not personally return a verdict that assessed the death penalty. Although this response was later changed, the prosecutor remained unsatisfied Johnson would be willing to answer the special issues so that the punishment would be death. Prosecutors felt venire member Johnson's religious beliefs would interfere with her ability to render a verdict, and they were concerned about a comment she made that her decision might be affected by the fact that she and [Murphy] are the same age. She also stated that, in order to find [Murphy] guilty, the other parties to the murder would have to testify. Finally, prosecutors expressed the subjective belief that venire member Johnson was not steadfast in her beliefs and was the type of person who would try to "accommodate" whomever she was talking with at the time.

8

Despite the opportunity to do so, counsel for [Murphy] made no effort to refute or rebut the State's reasons for striking this venire member.

(3) Venire member Cellers – Despite indicating on her questionnaire that she had never been arrested, prosecutors discovered that venire member Cellers had at least two prior arrests. There were indications she had been convicted of theft, which she denied until confronted. She also had been arrested for forgery, for which she provided an explanation that prosecutors said they found "incredible." Venire member Cellers also admitted she had a sister who had experienced previous confrontations with police.

Counsel for [Murphy] argued that prosecutors engaged in disparate questioning of venire member Johnson [sic][3] because the only inquiries made were of her past criminal background. This occurred despite the fact that a white venire member, Ladonna Smith, also had a prior criminal history, but the State never questioned her or inquired about it.[4]

. . .

After reviewing the available record, we can discern no abuse of discretion behind the trial court's decision to overrule [Murphy]'s *Batson* objections. The trial court could have reasonably concluded the State's race-neutral explanations were valid, and the peremptory strikes were not racially motivated.

*Murphy*, No. 73,194, slip op. at 21-23, 24 (first footnote added and second footnote in original).

The district court accepted the following findings from the MJ's report and recommendations:

The Court first notes that the reasons given by the

---

[3]Examination of the **Batson** hearing transcript reveals that this reference should be to Cellers, not Johnson.

[4]The record indicates that a jury was empaneled before venire member Smith could be individually questioned by the involved parties.

9

prosecution for peremptorily excusing the five African-American venirepersons were race-neutral. Robinson stated that her service on the jury could cause a family conflict, because one of her children was friends with the defendant, while another child was friends with the victim. In her questionnaire, Cellars denied that she had been arrested or convicted of any criminal offenses. Under questioning, she admitted being both arrested and convicted, within the past ten years, of shoplifting and of cashing a stolen check, then claimed that she was in fact innocent and gave an unlikely explanation. Johnson gave inconsistent answers; the prosecution attempted to challenge her for cause on two occasions, only to be interrupted by the trial court, which rehabilitated her. Both Brewer and Gladney consistently confused "beyond a reasonable doubt" with "no doubt." Further, Brewer appeared not to believe in, or not to understand, the concept of parole, and Gladney was personally opposed to the death penalty.

To establish pretext, Murphy attempted to show that similarly situated white venirepersons were treated differently. He pointed out that the prosecution failed to use one of its peremptory challenges on [Cora] Elder [("Elder")], a non-African-American, despite her also responding that she would have to be "without a doubt" of the defendant's guilt in order to sentence him to death. However, a close examination of the *voir dire* reveals that, unlike Brewer and Gladney, Elder quickly backed off from that position under questioning. Accordingly, this Court finds that Elder was not similarly situated to Brewer and Gladney. Murphy also pointed out that a non African-American venireperson named LaDonna Smith had, like African-American venireperson Cellars, been arrested and denied this fact on her questionnaire, but, unlike venireperson Cellars, the prosecution never questioned her on this point. The trial court denied Murphy's challenge as to venireperson Smith without explanation, and without requiring the prosecutor to respond.

While the prosecution's reasons for peremptorily challenging venireperson Cellars were valid, its failure to ask similar questions of venireperson LaDonna Smith, who appeared similarly situated, do[es] raise an inference of pretext. Since a finding of pretext as to a single juror requires that a conviction be vacated, *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 n. 13 (1994), this Court held an evidentiary hearing in order

10

to determine why juror Smith was not also questioned about her criminal history.

Trial prosecutor Al Smith testified that to him, convictions were more significant than arrests, and recent arrests were more significant than older ones. He testified that venireperson Smith's criminal history consisted of only an arrest, not a conviction; that the arrest was over 20 years old, and that the notation of the crime for which she was arrested, "ASC," was not a crime that he even recognized, but in any event, it did not appear to be a felony. He also testified that because venireperson Smith was one of the last venirepersons questioned, she was not likely to be called to serve and he was tired at the time he was questioning her, so he just decided to hurry up at (sic) get through her *voir dire* without asking her about the arrest. Finally, he testified that he probably would have peremptorily challenged her on the basis of the false answer about her arrest if she did become eligible for the *petit* jury.

Prosecutor Smith's explanation is not without problems. Because he did not know the crime for which venireperson Smith was arrested, the prudent course would have been simply to ask her, rather than to peremptorily challenge her. His claim that he was trying to hurry through the *voir dire* because she was near the end of the pool is belied by the fact that he took almost three times as much time with Smith as he did with Cellars.

Notwithstanding these discrepancies, that venireperson Smith's arrest did not result in a conviction and was more than twenty years old establishes that she was not similarly situated with venireperson Cellars, so the difference in the questioning they were subjected to cannot be said to have resulted from no other reason besides race. The Court, therefore, finds that the State's rejection of Murphy's *Batson* challenge was not unreasonable.

***Murphy v. Dretke***, No. 5:02cv086, slip op. at 15-16 (E.D. Tex. Aug. 20, 2004) (unpublished). The district court noted that "[i]n reviewing the record, the Court did not find any examples of disparate questioning other than those set forth in specific detail

11

by the magistrate judge in her findings." *Id.* at 16. The district court agreed that the differences in the questions could be explained by reasons other than the desire to exclude venirepersons because of their race. *Id.* In response to Murphy's objection that the MJ erred by not finding Cellers and L. Smith similarly situated, the district court considered what evidence was introduced at the hearing and noted that nothing indicated that L. Smith was convicted or that the term "ASC" referred to a felony offense. *Id.* at 17. Moreover, the district court, like the MJ, could not say that the trial court's rejection of Murphy's *Batson* claim was unreasonable because the facts that L. Smith was not convicted and that her arrest occurred 20 years before Murphy's trial "render[ed] her situation sufficiently distinguishable from venireperson Cellars." *Id.*

Murphy argues the trial court's *Batson* adjudication and the district court's evaluation of its further evidentiary hearing and subsequent findings against him resulted in a decision that was unreasonable in light of the evidence presented and contrary to clearly established federal law as determined by the Supreme Court. Murphy asserts that through examination of the trial record and the evidentiary hearing, it can be concluded that the State did not ask the same questions of African-American venirepersons compared to the non-African-American venirepersons and that the questions asked of the African-American venirepersons were designed to elicit disqualifying information. Murphy argues that the record shows that the State deviated from its "script" used to question prospective jurors during its questioning of African-American venirepersons.

As to Gladney, Murphy asserts that the defense noted for the

12

record that the State did not object to one prospective Caucasian juror, John Smith ("J. Smith"), who also showed up chewing gum, or to another prospective Caucasian juror, Elder, who had a similar definition of "beyond a reasonable doubt" as Gladney. Murphy cites *Emerson v. State*, 820 S.W.2d 802, 804 (Tex. Crim. App. 1991), for the proposition that a neutral explanation for a peremptory strike against a member of a protected group is suspect when the State did not use an unexhausted peremptory against a similar juror who was not a member of that group. Moreover, Murphy contends the defense stressed at the *Batson* hearing that disparate questioning had been used on Gladney. *See* *Keeton v. State*, 749 S.W.2d 861, 866 (Tex. Crim. App. 1988) (noting disparate questioning can evidence pretext).

Murphy contends the evidentiary hearing was subject to the risks of distortion and imprecision from the passage of time because it took place years after the actual *voir dire*. Murphy also argues that the MJ and district court incorrectly determined that L. Smith was not similarly situated to Cellers and that such disparate questioning was related to race-neutral reasons. Murphy maintains prosecutor A. Smith's explanation for peremptorily challenging Cellers is flawed because A. Smith was merely commenting on unknown factors to the court, such as that "A.S.C." was not known by him to be a felony. Murphy stresses he should not be held to a search that did not explain any conviction of L. Smith years after his case was tried, when a search at the time of *voir dire* might have produced evidence that L. Smith was convicted and what crime "A.S.C." represented. Without any information about whether L. Smith was convicted and what "A.S.C." stood for, Murphy argues prosecutor A. Smith's explanation that recent arrests were

13

more significant than older ones is not logical. Murphy also points to Henry's testimony that he recalled Caucasian venirepersons being told about the definitions and circumstances of capital murder and being asked about issues of the case, while the African-American venirepersons were asked about reasonable doubt and their criminal background. Henry also stated that most African Americans in Bowie County were Southern Baptists and had a different understanding of reasonable doubt, which was a method that the State could use to disqualify African-American venirepersons.

The Director responds that Murphy's disparate questioning claims lack merit. The Director argues that the record does not support Murphy's contention that the State disparately questioned African-American venirepersons or that the stated reasons for the strikes at the **Batson** hearing were pretextual. While the Director acknowledges that the peremptory striking of five out of six African-American venirepersons does appear to be "suspect," he emphasizes that Murphy has failed to prove his claims of discrimination before two factfinding courts and that the State accepted the sixth African-American venireperson, who was then struck by the defense.

The Director argues that the district court did not err in concluding that the state court's decision to deny Murphy relief was reasonable. First, the Director notes that Murphy provides very little record evidence to support his conclusory claims. The Director challenges Murphy's citation in his brief to the entire *voir dire* record and thus contends Murphy has not met Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts, which requires a petitioner to plead facts in

14

support of his claims. *See, e.g.,* **Koch v. Puckett**, 907 F.2d 524, 530 (5th Cir. 1990) (holding petitioner's conclusory allegations failed to establish valid ineffective assistance of counsel claim); **Ross v. Estelle**, 694 F.2d 1008, 1012 (5th Cir. 1983) (reemphasizing that "mere conclusory allegations do not raise a constitutional issue in a habeas proceeding").

The Director argues the record instead demonstrates that potential jurors were treated the same, regardless of race. The Director asserts that although the State did immediately question two of the three African-American venirepersons it struck due to their expressed personal opposition to the death penalty – Gladney and Johnson – the record demonstrates that the State likewise immediately questioned a Caucasian venireperson, Barbara Whittington, about her views on the death penalty and ultimately struck her based on those views. The Director maintains that the other African-American venireperson struck due to her death penalty views, Robinson, was not immediately questioned on the death penalty because her questionnaire, in addition to indicating a reluctance or hesitancy to impose the death penalty, indicated a stronger family conflict concern in the State's mind – the fact that one of Robinson's sons was "good friends" with Murphy, and another son knew the victim. The State eventually questioned Robinson about her questionnaire answer on the death penalty, where she had indicated she could not personally assess it, and decided to strike her based on such views. The Director argues this corroborates prosecutor A. Smith's assertion that he used the *voir dire* questionnaires to tailor his examination of potential jurors.

As to Gladney, the Director responds to Murphy's pretext arguments by noting that while Caucasian venireperson J. Smith was

15

also chewing gun, this passing similarity of an affection for gum hardly impeaches the State's motivations regarding Gladney. Unlike Gladney, J. Smith showed himself to be an extremely strong potential juror for the State. In particular, J. Smith stated he favored the death penalty and perceived the job of criminal defense attorneys as "finding loopholes." The Director notes the defense excused J. Smith. The Director also argues that examination of the record reveals that unlike Gladney, who insisted he would only impose the death penalty if guilt had been shown with "absolutely no doubt," Elder merely misspoke as to the "beyond a reasonable doubt" standard. The Director notes Elder was a stronger potential State juror because she had previously been a victim of a violent crime, had friends in law enforcement, and remarked that the death penalty should be an option whenever someone intentionally takes a life.

As to Brewer, the Director asserts that Murphy has never argued a specific pattern of disparate questioning regarding him. Although the Director agrees with Murphy that Brewer was questioned as to the burden of proof, the Director notes that Murphy has never contended that there was a similarly situated Caucasian venireperson who was not identically questioned. The Director argues that there was ample reason for the striking of pro-defense Brewer; he expressed clear views in favor of the defense and conveyed his belief that capital punishment should only apply when there is "no doubt" of a person's guilt and the person admits to committing the crime. Moreover, the Director notes Brewer also would require the State to prove the future dangerousness issue beyond "any or no doubt" – Brewer also suggested this issue could never be answered because no one could accurately predict the future.

Finally, the Director contends Murphy's arguments that the State's stated reasons at the **Batson** hearing as to Cellers were pretextual lack merit. The Director argues that any alleged disparate treatment between venirepersons Cellers and L. Smith is due to the fact that they were not similarly situated. In fact, the Director emphasizes that though Murphy relies heavily upon the MJ's report that notes certain concerns with the State's given reasons for the different questioning, Murphy fails to give due consideration to the MJ's ultimate determination, with which the district court agreed, that the state courts were not unreasonable in finding a lack of purposeful discrimination. According to the Director, Cellers provided false statements about her criminal history in her questionnaire; only when confronted did she admit to having served probation for theft and denied responsibility. Cellers also belatedly admitted to being arrested for forgery in 1991 and again denied responsibility. In contrast, venireperson Smith's allegedly omitted criminal history reflects a single unknown "A.S.C." arrest notation over 20 years old at the time of trial. The Director also notes that L. Smith was one of the last panel members and that the jury was chosen before either side had to decide whether to accept her as a juror.

The Director finally notes that aside from the State not questioning L. Smith about her criminal history, a similar pattern of questioning was followed as with other venirepersons: Smith was first questioned about her views on capital punishment, specifically a reference to her statement that she would hate to make that decision, then was questioned about her beliefs regarding the minimum sentence for capital murder. Moreover, prosecutor A. Smith testified he probably would have struck venireperson L. Smith. While the Director allows that the MJ did find certain

17

discrepancies in prosecutor Smith's explanations for the different questioning, the Director insists that the MJ correctly assessed, after an evidentiary hearing – and the district court correctly agreed – that pretext was not shown because Cellers and L. Smith were sufficiently distinguishable such that the different questioning did not result from any racially motivated reason.

We find the Director's arguments here to be persuasive. While at first and limited glance the stark numbers presented by Murphy appear to be compelling (five of six African-American venirepersons were peremptorily struck by the State), that cannot signal the end of our inquiry. Based on our careful review of the record, and under the requisite AEDPA deference, we cannot say that the district court clearly erred in its factual findings that the State's reasons for striking the African-American venirepersons at issue were valid and not racially motivated or that the district court erred in its legal conclusion that Murphy had not proven his **Batson** claim.

Here, Murphy did not rebut the state court's factual findings with clear and convincing evidence; Murphy did not show that the State's individualized reasons for peremptorily striking each African-American venireperson at issue were actually a pretext for racial discrimination or that any alleged disparate questioning did not result from reasons other than race. While we note that the MJ revealed certain inconsistencies in prosecutor A. Smith's testimony regarding the disparate questioning of venirepersons Cellers and L. Smith during the evidentiary hearing, we agree with the Director that Murphy has not met his burden to prove that discrimination was inherent in the State's explanations for striking each African-American venireperson at issue. *See* **Hernandez**, 500 U.S. at 359. Therefore, we, like the state courts and the federal court below,

18

accept that the reasons offered by the State were valid and race neutral. *See* *id.* We find nothing in this record indicating that the trial court's determination of the State's neutrality with respect to race was objectively unreasonable and nothing which rebutted such determination with clear and convincing evidence. *See* **Miller-El**, 537 U.S. at 341. We thus agree with the district court and find that the state court's conclusion that the trial court did not abuse its discretion in determining that Murphy had not met his burden to show discrimination under **Batson** and that such determination was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

We are aware that we file this opinion less than one month after the Supreme Court handed down its decision in **Miller-El v. Dretke**, 545 U.S. ___, 2005 WL 1383365 (Jun. 13, 2005) (**Miller-El II**), in which a six-justice majority of the Supreme Court reversed a decision of another panel of this Court – which had affirmed both the state court's and federal district court's determination that the petitioner Miller-El should not receive relief on his **Batson** claim. In doing so, the Court considered the type and quantum of record evidence required to demonstrate a **Batson** violation. The Court did not announce any new elements or criteria for determining a **Batson** claim, but rather simply made a final factual and evidentiary determination of that particular petitioner's **Batson** claim pursuant to the "demanding but not insatiable" standard set forth in 28 U.S.C. § 2254(d)(2) and (e)(1). **Miller-El II**, 2005 WL 1383365, at *8.

Here, we have thoroughly combed the record of the *voir dire* conducted in Murphy's state court capital murder trial; and our detailed "side-by-side comparisons of black venire panelists who

19

were struck and white panelists allowed to serve" do not indicate that any differences in questioning or treatment resulted from pretextual racial bias. *See Miller-El II*, 2005 WL 1383365, at *8 (noting the evidentiary strength of such close comparisons). Moreover, there is neither evidence in this record of: (i) any, much less multiple, jury shuffles occurring in the state trial court which resulted in the increasingly lower statistical presence of African Americans within the jury venire; nor (ii) a 20-year-old, or indeed any, manual from the State District Attorney and other testimonial evidence suggesting the historic use of peremptory strikes against African-American venirepersons during jury selection, both of which were decisive factors in *Miller-El II*. *Id.* at *13, 17-18.

We recognize that *Miller-El II* may be the first ring of the death knell for peremptory challenges, *id*. at *21-22 (Breyer, J., concurring), and that the Supreme Court may well grant *certiorari* in this case to finally bury the concept of peremptory challenges. We see nothing in *Miller-El II*, however, that compels us to reach that conclusion here in *Murphy* and leave it to the Supreme Court to say whether *Miller-El II* will extend that far.

## CONCLUSION

Having carefully reviewed the record of this case and the parties' respective briefing, for the reasons set forth above, we AFFIRM the judgment of the district court.

**AFFIRMED.**

20