# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 25, 2010

No. 09-70027

Lyle W. Cayce
Clerk

STEVEN MICHAEL WOODS

Petitioner–Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent–Appellee

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:06-CV-00344-LED

Before BENAVIDES, PRADO, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Steven Michael Woods was convicted of capital murder and sentenced to
death in Texas state court.  The district court denied Woods's petition for writ
of habeas corpus but granted Woods a certificate of appealability on three issues:
(1) whether his counsel rendered ineffective assistance by failing to fully
investigate and present certain mitigating evidence; (2) whether his counsel
rendered ineffective assistance by failing to investigate or present evidence to

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 09-70027

challenge the reliability of his alleged inculpatory statements; and (3) whether he was denied his right to the assistance of counsel during custodial interrogation when inmate Gary Don Franks elicited information from Woods while he was incarcerated. Woods raises only the first issue in the instant appeal, thus we address only the issue of whether trial counsel rendered ineffective assistance during the punishment phase of Woods's trial.

Woods argues that the state court and district court erred in denying relief for this claim without allowing evidentiary development. He asks this Court to vacate the district court's denial of relief and remand the case for further evidentiary development. He argues that the district court incorrectly applied precedent from the *Strickland–Wiggins* line of cases when it (1) did not consider all material evidence in evaluating the prejudice prong of his *Strickland–Wiggins* claim; (2) denied an evidentiary hearing and relied on the state court findings of fact and conclusions of law, which resulted from a procedurally inadequate paper hearing; and (3) failed to focus on the possible influence of omitted mitigation evidence upon the individual jurors.

We find that the state court determination of ineffective-assistance-of-counsel claim is not objectively unreasonable, and thus we affirm the district court's denial of habeas relief on this claim. Additionally, we do not find that the district court abused its discretion in denying an evidentiary hearing given that the state court habeas proceedings were full and fair.

## I. FACTS AND PROCEDURAL HISTORY

The district court set forth the relevant facts in this case:

> Early in the morning of May 2, 2001, two golfers driving down Boyd Road at the Tribute Golf Course near The Colony, Texas, found the bodies of Ron Whitehead and Beth Brosz. Both had been shot in the head and had their throats cut. Whitehead was dead; Brosz was still alive but after receiving medical care, she died the next day. That evening, police received several anonymous tips that Woods was involved in the killings, along with one Marcus Rhodes.

2

No. 09-70027

Detectives interviewed Woods, who admitted to being with the victims the night before their bodies were found.  He said that he and Rhodes had agreed to lead Whitehead and Brosz to a house in The Colony owned by someone named "Hippy," but that their two vehicles became separated during the trip, so he and Rhodes returned to the Deep Ellum section of Dallas.  Woods was not arrested as a result of his interview.  Detectives then interviewed Rhodes, and after a search of his car revealed items belonging to Whitehead and Brosz, Rhodes was arrested.

Woods left the Dallas area, traveling to New Orleans, Idaho and California, where he was finally arrested.  Several witnesses testified that before the killings he told them about his plan to commit the murders, and after the killings, he told them about his participation in them.

*Woods v. Quarterman*, No. 6:06-CV-344, 2009 WL 2757181, at *1 (E.D. Tex. Aug. 26, 2009).  On April 18, 2002, Woods was indicted for capital murder for the killing of more than one individual in the same criminal transaction, for which he was found guilty by a Denton County jury.

During a separate punishment hearing, the State, in addition to evidence about the circumstances of the crime and Woods's moral culpability, presented evidence that Woods was involved in the murder of another individual in California one-and-a-half months prior to the murders of Whitehead and Brosz; that Woods got into a fight with another inmate in the Denton County Jail; that Woods, Rhodes, and two other accomplices planned to rob a clothing store in Deep Ellum; that Woods may have planned to murder a woman who was coming to pick up vials of "acid" to sell; and that Woods made "bottle bombs" as a juvenile.

Woods's attorneys, Jerry Parr and Derek Adame, presented only the expert testimony of Robin Neely, a licensed master's social worker with an advanced clinical practitioner certification and a licensed marriage and family therapist.  Neely had reviewed records from the defendant's four hospitalizations at Havenwyck Hospital and St. Joseph Mercy Hospital, all occurring when the

No. 09-70027

defendant was between the ages of thirteen and eighteen. The records included family and social histories taken at that time. She testified that Woods's behavioral problems—including drug use, continuing self-injurious behaviors such as cutting himself, minor sexual assault, and eventually antisocial behavior—stemmed from a horrible upbringing that was filled with physical and emotional abuse by his father; devoid of any structure, support, or affection from his mother; and completely lacking in any sort of accountability for his actions. Neely testified that if the family or the juvenile justice system had addressed his behavioral problems and provided for ongoing treatment earlier in his lifetime, Woods could have reversed his downward spiral into drug abuse and self-injurious and antisocial behavior.

After hearing both sides, the jury found beyond a reasonable doubt that (1) there was a probability that Woods was a continuing threat to society; (2) Woods actually caused the death of the victims, intended to kill the victims, or anticipated that the lives of victims would be taken; (3) there was no sufficient mitigating circumstance to warrant a sentence of less than death after taking into consideration the circumstances of the crime and the evidence of Woods's character, background, and personal moral culpability. In accordance with state law, the trial judge sentenced Woods to death. On direct appeal, the Texas Court of Criminal Appeals ("CCA") affirmed Woods's conviction and sentence. *See Woods v. State*, 152 S.W.3d 105 (Tex. Crim. App. 2004). The Supreme Court denied certiorari. *See Woods v. Texas*, 544 U.S. 1050 (2005).

Woods then presented fifteen allegations challenging the validity of his conviction and sentence in his application for state post-conviction relief. The same state trial judge who had presided over Woods's trial, Lee Gabriel, considered Woods's application for state habeas relief. Without holding an evidentiary hearing, Judge Gabriel made seventeen pages of findings of fact and made six conclusions of law, including the conclusion that Woods was not denied

No. 09-70027

the effective assistance of counsel during any phase of the trial. Among the findings of fact that the trial court made as to Woods's claim that his counsel rendered ineffective assistance during the punishment hearing were the following:

1)      Based upon the credible affidavit of the government's lead prosecutor, Michael Moore, the government had additional evidence that it could have presented to prove Woods was a future danger including evidence of bomb-making, sexual assault, documentation from mental hospitals that Woods hated society and was sadistic, school officials who could not testify to anything favorable or redeeming about the defendant, sexual abuse of his younger brother, escalating physical abuse of siblings and dogs, affiliation with white supremacists, theft, drug dealing, and that even Woods's fiancée and her family would testify as to Woods's negative character.

2)      Based upon the credible affidavits of Woods's trial counsel, attorneys Parr and Adame, that trial counsel had hired Dr. Kelly Goodness, an expert witness, who interviewed Woods and reviewed his records. She declined to testify because in her professional opinion, she could not say that Woods was not a future danger, and no objective mitigation expert could credibly do so either.

3)      Based upon the credible affidavits of Parr and Adame, that trial counsel's decision to present Robin Neely as an expert witness after only a review of Woods's medical, school, juvenile, and family records constituted a sound strategy of trying to demonstrate Woods's poor and neglected upbringing and the significance of this history in assessing Woods's behavior.

4)      Based upon the credible affidavits of Parr, Adame, and Moore, that Woods's mother, Cheryl Boyagian, was available to testify but that her discussion with Adame revealed that her testimony would hurt Woods's

5

No. 09-70027

mitigation case, and thus trial counsel's decision not to present Cheryl Boyagian constituted sound trial strategy.

5) Based on credible affidavits of Parr and Adame, that Woods's father, Steven Woods Sr., could not offer any evidence favorable or beneficial to Woods.

6) Based on credible affidavits of Parr, Adame, and Moore, that trial counsel had full and complete knowledge of available mitigation evidence.

7) Based upon the credible affidavits of Parr, Adame, and Moore, that the decision by trial counsel not to call family members and friends of Woods constituted a sound trial strategy after a conscious decision to avoid the proffer of damaging rebuttal evidence by the Government.

8) Based upon credible affidavits of Parr, Adame, and Moore, and the evidence presented at trial, that the evidence of mitigation and future dangerousness that was  detrimental to Woods far outweighed the evidence favorable to Woods.

Accordingly, Judge Gabriel recommended that post-conviction relief be denied because Woods failed to meet his burden of proof of counsel's deficient performance and harm. *See Ex Parte Woods*, 176 S.W.3d 224, 225 (Tex. Crim. App. 2005).

The CCA adopted the findings of fact and conclusions of law, and denied relief. *Id.* For the ineffective-assistance-of-counsel claim for failure to investigate mitigating circumstances, the CCA supplemented Judge Gabriel's findings of fact and legal conclusion with an extended discussion of why the court was denying relief on this claim. The CCA noted that trial counsel had conducted an investigation: "[T]hey spoke with applicant's family members, tracked down medical, psychological and school records, used expert witnesses, and extensively interviewed applicant himself regarding potential mitigating evidence." *Id.* at 226. The CCA further noted that trial counsel had hired two

expert witnesses, one of whom interviewed applicant extensively and fully reviewed his social and medical history. The CCA found that after Dr. Goodness stated she could not testify, trial counsel took her advice and hired another expert to review Woods's records without conducting a face-to-face interview. *Id.* at 227. The CCA gave credence to trial counsel's assertion that given Dr. Goodness's opinion and advice, they made a strategic decision to present only an objective, clinical opinion of an expert witness who could not be subject to a cross-examination on her personal knowledge of Woods's previous behavior.

Additionally, the CCA held that the trial counsel's decision not to interview any potential mitigation witnesses other than the mother was based on "'reasonable professional judgments [supporting] the limitations on investigation.'" *Id.* The CCA outlined the extensive amount of rebuttal evidence the State was prepared to present if Woods's attorneys were to call witnesses who would testify as to personal knowledge of mitigating circumstances. The CCA also found that the State had informed the defense that Woods's "stepfather, fiancee, and his fiancee's family were willing to testify for the State as to applicant's anti-social, sadistic behavior and bad character." *Id.* The CCA found that it was a sound strategic decision not to interview or present witnesses who could testify to mitigating circumstances, but who would also be subject to cross-examination regarding their knowledge of Woods's involvement in Satanism, his bomb-making activities, and his abusive behavior toward animals and loved ones. *See id.* Finding all this and that Woods himself was unwilling to discuss mitigating evidence or the damaging information that State could present, the CCA held that the applicant failed to prove that his attorneys rendered ineffective assistance of counsel and thus denied relief.

Woods then filed an application for habeas corpus in the U.S. District Court for the Eastern District of Texas. In a memorandum opinion and unpublished order, the district court denied the first seventeen claims for relief

in Woods's application for habeas corpus, including the three claims in the appeal before us, and dismissed with prejudice the eighteenth and final claim in Woods's application for a writ of habeas corpus. *Woods*, 2009 WL 2757181, at *21. As to the claim at issue in the instant appeal, the district court assessed Woods's contentions that his defense counsel should have: (1) interviewed and presented friends and acquaintances who could speak to his character and his abused childhood; (2) more fully investigated and presented evidence of his mental illness and neurological condition; and (3) interviewed and presented family members who could speak to his background and character.

As to the first claim, the district court noted that in addition to the government's disclosure of potential rebuttal evidence, the defense counsel had discovered an online diary kept by one of Woods's girlfriends that would paint him in a less sympathetic light. *Id*. at *3. The district court noted that this discovery likely gave credence to the prosecution's disclosure that they had numerous witnesses who could attest to defendant's bad character, violence, and bad acts. *Id*.

As to the neurological claim, the district court noted that defense counsel hired Dr. Kelly Goodness, a psychologist, and provided her with Woods's psychiatric records. *Id*. The district court found no indication that Dr. Goodness told counsel that further investigation into his psychiatric conditions was necessary. *Id*. Thus, the district court held that the state court was not unreasonable in its conclusion that counsel's decision not to seek further neurological testing was not deficient performance. *Id*.

However, the district court disagreed with the state court findings as to whether counsel should have further investigated and called family members as witnesses to Woods's abused and dysfunctional upbringing. *Id*. at *5. The district court pointed out in particular the testimony of Neely that Woods's mother interfered with Woods's stepfather's attempt to impose discipline by

No. 09-70027

calling Child Protective Services on him for abuse. *Id*. The district court noted that given counsel's strategy to objectively demonstrate the extraordinarily poor upbringing to which Cheryl Boyagian had exposed Woods, they should have at least attempted to interview Woods's siblings about alleged physical abuse they suffered at the hands of their stepfather. *Id*. However, in assessing the prejudice element of the *Strickland–Wiggins* test *de novo*, the district court found that Woods had failed to prove prejudice because (1) it was unlikely that defense counsel would have presented such evidence as it could have weakened counsel's defense that Woods's mother was unfeeling and indifferent, and (2) even if Woods's brothers did testify, their testimony may not have been credible given that Child Protective Services had found the charges to be unsubstantiated. *Id*. Accordingly, it denied relief as to this claim.

Though it denied relief for all claims in Woods's application, the district court granted a COA on three issues. Woods has only raised the first issue in this appeal. Thus, we consider only whether trial counsel rendered ineffective assistance by failing to fully investigate and present certain mitigation evidence during the punishment phase of Woods's trial.

## II. DISCUSSION

We find that the district court did not abuse its discretion in denying an evidentiary hearing and affirm the district court's decision to deny relief. We address the merits of the ineffective-assistance claim first, then address Woods's procedural arguments for why the district court erred in its denial of an evidentiary hearing.

### A.    Ineffective Assistance of Counsel Claim

#### 1.    Standard of Review

Because an ineffective assistance claim is a mixed question of law and fact, we review the district court's denial of habeas relief *de novo*. *Ladd v. Cockrell*, 311 F.3d 349, 357 (5th Cir. 2002) (citing *Crane v. Johnson*, 178 F.3d 309, 312

No. 09-70027

(5th Cir. 1999). However, this habeas petition is governed by the standards established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The 1996 amendments to 28 U.S.C. §2254 "circumscribe our consideration of [Woods's] claim and require us to limit our analysis to the law as it was 'clearly established' by the precedents existing at the time of the state court's decision." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Under AEDPA, a federal court cannot grant habeas relief for any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Wiggins*, 539 U.S. at 520. "We review pure questions of law under the 'contrary to' standard of subsection (d)(1), mixed questions of law and fact under the 'unreasonable application' standard of subsection (d)(1), and pure questions of fact under the 'unreasonable determination of facts' standard of sub-section (d)(2)." *Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir. 2000) (citation omitted).

Under subsection 2254(d)(1), a decision is contrary to federal law if the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or (2) "confronts facts that are materially indistinguishable from relevant Supreme Court precedent and arrives at a result opposite to [that precedent]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application" clause of subsection 2254(d)(1), a federal habeas court may grant relief if the state court (1) "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies it to the facts of the particular state prisoner's case," (2) "unreasonably

extends a legal principle from our precedent to a new context where it should not apply," or (3) "unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. Under the "unreasonable application" clause, "the state court's decision must have been more than incorrect or erroneous"; "[t]he state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520–21 (citing *Williams*, 529 U.S. at 409); *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005).

In deciding whether to grant relief, we must presume that the state court's factual findings were correct unless Woods meets his burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(3)(1); *Murphy*, 205 F.3d at 813. "The presumption is especially strong when, as here, the state habeas court and the trial court are one and the same." *Id.* (citations omitted).

### 2. Analysis

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*'s two-part standard. 466 U.S. 668, 687 (1984). Under this standard, Woods must show that (1) counsel's performance was deficient, and (2) this deficiency prejudiced the defendant. *Id.* For counsel's performance to be deficient, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Id.* at 688. There is no checklist for judicial evaluation of attorney performance. Instead, the performance inquiry is on "whether counsel's assistance was reasonable considering all the circumstances" because no checklist for counsel's conduct "can take into account . . . the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89.

Our assessment of counsel's performance is "highly deferential." *Id.* at 689. We make every effort to "eliminate the distorting effects of hindsight." *Id.* Because of the difficulties of such analysis, we recognize a "strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation and quotation marks omitted). We will not find counsel's performance deficient "merely because we disagree with trial counsel's strategy." *Crane*, 178 F.3d at 312.

In a capital sentencing proceeding, "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 239 F.3d 683, 688 (5th Cir. 2001) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332–33 (5th Cir. 1983)). Like any claim of ineffective assistance of counsel, we scrutinize the reasonableness of counsel's investigation in light of all relevant circumstances and give deference to counsel's decision to pursue a sound trial strategy. But in explaining how to assess investigation choices in *Wiggins v. Smith*, the Supreme Court noted:

> "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments."

*Wiggins*, 539 U.S. at 521–22 (quoting *Strickland*, 466 U.S. 690–91).

Thus, the relevant inquiry here is not whether counsel had *some* evidence to stop investigating, but rather (1) what evidence was already known to counsel, and (2) based on the evidence available, would a reasonable attorney continue to investigate or limit further investigation. *Id.*; *see, e.g.*, *Rompilla*, 545 U.S. 374 (holding that counsel was ineffective for deciding to forgo looking at material

that the prosecution would probably rely on even though interviews with the capital defendant and members of his family suggested no mitigating evidence was available).  However, the Supreme Court has emphasized that *"Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," nor "does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case."  *Wiggins*, 539 U.S. at 532.  Rather, *Strickland* requires counsel to ensure their decisions to limit investigations are supported by "reasonable professional judgment."  *See id.*

In addition to proving counsel's performance was deficient, the petitioner must also show that counsel's failure prejudiced his defense.  *Id.* at 534.  To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different."  *Id.* (citing *Strickland*, 466 U.S. at 694).  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.* (citing *Strickland*, 466 U.S. 694).  In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.  *Id.*  In reweighing this evidence, we consider all evidence adduced at trial and at the habeas proceedings.  *Williams*, 529 U.S. at 397–98.  We may approach the *Strickland–Wiggins* inquiry in any order; "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  *Strickland*, 466 U.S. at 697.

In accordance with § 2254, we must determine whether the state court's application of the precedent from the *Strickland–Wiggins* line of cases to the facts of this case was objectively unreasonable.  We find that it is not.  We agree with the CCA that trial counsel exercised reasonable professional judgment in deciding not to further interview or present Woods's family members, friends,

or acquaintances in light of the great amount of potentially harmful rebuttal evidence the prosecution was ready to present. As to Woods's contention that trial counsel should have further investigated the possibility of neuropsychological impairment, we find that Woods has failed to carry his burden of proving prejudice. We address each of Woods's contentions in turn.

### a. Family, Friends, and Acquaintances as Potential Mitigation Witnesses

Woods argues that trial counsel rendered ineffective assistance by failing to interview or present family members, friends, and acquaintances who could speak to his good character, his abuse- and neglect-filled upbringing, and his background. After reviewing the state court's opinions, we do not find the CCA's determination objectively unreasonable; we agree that trial counsel's decision not to present Woods's mother as a witness or  interview Woods's family members, friends, and acquaintances was based on reasonable professional judgment.

In assessing whether counsel's performance was deficient in *Wiggins*, the Supreme Court found that trial counsel's decision to stop investigation of the defendant's background for mitigation evidence was unreasonable. There, trial counsel claimed that their decision to limit their investigation into the defendant's background to a review of the defendant's pre-sentence investigation report and Department of Social Services records reflected a strategic decision not to present mitigating evidence, and instead to prepare and pursue an alternative strategy. *See Wiggins*, 539 U.S. at 517. The Court held that this decision was unreasonable because (1) standard practice required preparation of a social history report; (2) the limited evidence trial counsel had revealed leads to mitigating evidence of a horrible childhood filled with incidents of sexual and physical abuse that any reasonable, competent attorney would have pursued;

and (3) a thorough investigation of those leads "was necessary to making an informed choice among possible defenses." *Id*. at 524–27. The Court underscored that unlike in cases where limited investigations were reasonable, Wiggins's "counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless." *Id*. at 525.

Unlike in *Wiggins*, where trial counsel had no evidence that a mitigation case would have been counterproductive or that further investigation would have been fruitless, *id*., the trial counsel here had been informed of an extensive amount of rebuttal evidence that the State was prepared to present if they called witnesses to speak on their personal knowledge of Woods's good character and dysfunctional upbringing. Much of this information was already documented in the medical records, which counsel reviewed with Dr. Goodness. Given this knowledge and Dr. Goodness's professional opinion that no objective expert could reach a conclusion that Woods did not pose a threat of future dangerousness, trial counsel's decision to limit their investigation and to refrain from interviewing and presenting members of Woods's family and circle of friends and acquaintances was reasonable. By pursuing a strategy of presenting the objective, clinical opinion of Robin Neely after a review of only paper records, Woods's attorneys were still able to introduce testimony about Woods's dysfunctional and abused upbringing without the possibility of witnesses being cross-examined on their personal knowledge of the defendant's bad character, traits, or acts. Thus, they were able to avoid extended questioning on Woods's involvement in Satanism, bomb-making activities, abuse of animals and his brothers, affiliation with white supremacists, and drug dealing.

The district court found trial counsel's performance deficient because they did not interview Woods's brothers to substantiate accounts that Woods had

suffered abuse from his stepfather. We disagree. This contention was well-documented in the Havenwyck and St. Joseph medical records, which Robin Neely reviewed before her testimony. Trial counsel had reviewed the medical records extensively with their expert witnesses and crafted a strategy to portray Boyagian as a self-centered, uncaring mother who missed counseling appointments and failed to regularly visit Woods when hospitalized. As the district court points out in its prejudice analysis, investigating Woods's mother's calling of CPS would have run counter to trial counsel's strategy and may not have been fruitful in proving the stepfather's abusive nature given that CPS found the allegations to be unsubstantiated. *Woods*, 2009 WL 2757181, at *5. Given that we must be "highly deferential" in our assessment of counsel's performance, *Strickland*, 466 U.S. at 689, we do not find counsel's performance deficient "merely because we disagree with trial counsel's strategy." *Crane*, 178 F.3d at 312.

Additionally, we also agree with the state court that trial counsel's decision not to present Woods's mother or biological father was the result of reasonable professional judgment and adequate investigation. The senior Mr. Woods repeatedly refused to testify and stated that he always knew his son would end up in some kind of trouble. Cheryl Boyagian refused to cooperate with trial counsel's strategy to present her as a bad mother because she believed she was a good mother who did the best she could. Furthermore, as Adame and Moore state in affidavits found credible by the state courts, Boyagian told Adame that, "'if [Woods] did it, then he deserves what he gets'" and that "'he got himself into this mess, he's got to get himself out.'" No reasonable attorney would want their witness to make statements such as those made by Woods's parents in front of the jury.

Given that we agree with the state courts that trial counsel was effective in their performance during the punishment phase, we do not reach the prejudice prong. Because we find that the CCA was reasonable in determining that these were strategic decisions based on reasonable professional judgment, we find that its determination of these contentions is not objectively unreasonable.

### b.    Neuropsychological Evidence

Woods also contends that trial counsel should have investigated and presented an explanation of Woods's behavioral and addiction problems from a psychiatric/psychological perspective. Given his well-documented history of polysubstance abuse, head injury, and possible family history of mental illness, he argues that neuropsychological evaluation was warranted. He argues that such an approach could have clarified for the jury that his substance abuse problems and behavior were medical issues rather than moral failings. After reviewing the state court proceedings and the evidence in the record, we cannot determine whether trial counsel's performance was sufficient or deficient, but we find that the defendant has failed to prove that he was prejudiced by counsel's decision not to pursue a neuropsychological explanation of his addictions or his behavior. Thus, we do not find the state court's legal conclusion that there was no ineffective assistance of counsel objectively unreasonable.

The district court rejected Woods's argument regarding the investigation and presentation of neuropsychological evidence after noting that there was no indication that Dr. Kelly Goodness, a licensed psychologist, told counsel that further investigation into his psychiatric conditions was necessary. Thus, it held that it could not find that the state court was unreasonable in its conclusion that counsel's decision not to seek further neurological and mental health testing was not deficient performance. However, in our review of the state court's findings

and legal conclusions and the record itself, we cannot say that we are convinced by the district court's reasoning. The state court trial judge, Judge Gabriel, made no specific finding of fact on why counsel decided not to pursue a neurological examination. The state court judge seems to have dispensed with this line of argument with his finding that any remaining contested issues were inconsequential because counsel's decision not to present evidence other than the testimony of Neely constituted sound trial strategy. The CCA opinion did not specifically discuss Woods's neuropsychological contention either. Spending most of its opinion discussing why interviews and presentation of family members and friends as potential mitigation witnesses were not necessary given the defense's sentencing strategy, the CCA merely states that "[w]hen an attorney opens Pandora's box, he is not constitutionally required to examine each and every disease, sorrow, vice, and crime contained therein before quietly and firmly closing the cover." *Ex Parte Woods*, 176 S.W.3d at 228.

It is not clear from the record or trial counsel's affidavits whether counsel's decision not to pursue this line of strategy was the result of reasoned judgment as required by *Wiggins*. The files from the Woods's stays at Havenwyck and St. Joseph Mercy document an extensive history of: substance abuse, including alcohol, marijuana, LSD, heroin, cocaine, speed, mushrooms, opiates, and ecstacy; diagnoses of depression, attention deficit disorder, and traits of borderline personality disorder; strong family history of substance abuse; possible history of bipolar disease on his father's side; and a history of frequent migraines. These indicators clearly necessitate some investigation.

It is undisputed that trial counsel hired Dr. Goodness to review these files and interview the patient. However, it is unclear whether Dr. Goodness's review included a determination of whether further neuropsychological testing or investigation was necessary or would be fruitless. Dr. Goodness stated that, in

her professional judgment, she could not testify that Woods was not a future danger; but, there is no indication that her review included an evaluation of whether Woods had a neurological or psychological impairment such that it would have altered his past behavior. A copy of Dr. Goodness's report is not in the record. Neither Parr nor Adame's affidavits identify why they chose not to pursue neurological testing or a mental health evaluation despite the fact that trial counsel's billing records show that at one time early in sentencing preparation they phoned a neurological testing facility. If trial counsel's decision to stop this line of investigation was motivated by an opinion or a piece of advice given by Dr. Goodness, counsel's performance would have been the result of reasoned judgment and thus sufficient. However, if the counsel had no reasoned basis to cease this line of investigation, it would have been deficient performance. Given the paucity of information in the state court opinions and the record on counsel's motivations in deciding not to pursue neuropsychological evaluation, we cannot say whether counsel's decision was sufficient or deficient performance.

However, even assuming, arguendo, that counsel's performance was deficient, we find that Woods has failed to carry his burden of proving that the alleged deficiency prejudiced his defense. In reweighing the totality of mitigating evidence, including the neuropsychological evidence that the petitioner argues should have been presented to the jury, against the aggravating evidence, we do not find that there is a reasonable probability that the outcome would have been different. *See Wiggins*, 539 U.S. at 534.

Woods argues that Supreme Court precedent in *Cone v. Bell*, 129 S.Ct. 1769 (2009), requires the courts to focus upon the possible effect of the evidence upon each individual juror rather than focus on the jury as a whole. We agree

No. 09-70027

and conduct the prejudice inquiry with the juror-agreement thresholds in mind.[1] Under Texas state law, there are three special issues that must be addressed before the death penalty can be imposed: (1) after consideration of all the evidence, including evidence of the defendant's background, character, or the circumstances of the offense, that there were sufficient mitigating circumstances to warrant a sentence less than death; (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (3) whether the defendant actually caused the death of the deceased, intended to kill the deceased, or anticipated that human life would be taken. TEX. CODE CRIM. PROC. art. 37.071 § (2)(b). To return an answer of "no" to the first issue and "yes" to the last two issues, the jury must be unanimous. TEX. CODE CRIM. PROC. art. 37.071 § (2)(d), (f). Thus, we conduct this prejudice inquiry to see whether the totality of the mitigating evidence, including the neuropsychological evidence, reweighed against the aggravating evidence would be sufficient to persuade one or more jurors to vote 'no' on each of these special issues.

The mitigation evidence that the petitioner argues should have been investigated and introduced is that (1) his drug addiction may have had short-

---

[1] In *Cone*, the jury was statutorily required to consider whether Cone's "'capacity . . . to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment.'" *Cone*, 129 S.Ct. at 1786 (citing TENN.CODE. ANN. § 39-2-203(j)(8) (1982) (repealed)). Under Tennessee law, the imposition of the death penalty required a unanimous finding by the jury that the state had proved beyond a reasonable doubt that there was at least one statutory aggravating circumstance not outweighed by the mitigating evidence. *Bell v. Cone*, 535 U.S. 685, 691 (2002) (citing TENN. CODE. ANN. § 2-204 (1982) (repealed)). The Supreme Court, therefore, found that the district court and the Sixth Circuit did not fully consider whether the suppressed evidence might have persuaded one or more jurors that Cone's drug addiction attributable to honorable military service was sufficiently serious to justify a punishment of life imprisonment. *Cone*, 129 S.Ct. at 1786.

term and long-term effects on his brain chemistry, affecting his behavior and cognition; (2) his drug abuse may have exacerbated his already imbalanced nervous system from his bipolar disorder; and (3) his polysubstance addiction problems, psychological disorders, and resulting behavioral problems may have resulted from genetic factors.[2]   Certainly, this type of information could have been mitigating if true. *See, e.g.*, *Porter v. McCollum*, 130 S.Ct. 447, 454 (2009) (finding that evidence of poor mental health or mental impairment, in addition to other mitigating evidence, could influence a jury's appraisal of defendant's moral culpability); *see also Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[E]vidence about defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to . . . emotional or mental problems . . . may be less culpable than defendants who have no such excuse."), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).  This evidence would have been in addition to the mitigating testimony given by Robin Neely, who described Woods's turbulent upbringing.

However, the problem with this type of evidence is that it can also be used as evidence of a probability of future dangerousness. One whose brain chemistry has been altered by prolonged substance abuse or who suffers from a mental disease because of a genetic predisposition would likely continue to pose a probability of future dangerousness.[3]   This would have undermined trial

---

[2] This expert opinion was provided by Dr. Paula Lundberg-Love, a licensed professional counselor and psychological associate in the state of Texas.  Dr. Lundberg Love reviewed the testimony during the punishment phase and the materials collected by Woods's post-conviction team.

[3] Woods's trial counsel, Adame, acknowledges a very similar line of reasoning when he discusses another potential line of mitigation testimony he had considered.  Based on Woods's statements to him that he had been awake for fourteen days and high on methamphetamines and a cocktail of other drugs when the murders of Whitehead and Brosz occurred, Adame considered having Woods testify to the fact that he was not in his right mind when the murders occurred.  Adame stated that Woods refused to testify, thereby preventing consideration of this mitigation strategy.  However, Adame added that though this evidence

counsel's strategy to present Woods as someone who would not be a future danger once he did not have access to drugs and was shown for the first time that actions have consequences, unlike when he had nearly unrestricted access to drugs and did not experience any discipline growing up with his mother.[4] Furthermore, the prosecution likely would have hired a mental health expert to examine Woods and potentially unearthed further aggravating evidence. *See* Mot. for Access, Clerk's R. vol. 1, at 20 (requesting that state trial court grant a fair opportunity to have a mental health expert examine Woods prior to testimony of any defense mental health expert testifying before jury). Such evidence could have included some of the incidents documented in the Havenwyck and St. Joseph's psychiatric records—bomb-making activities, abuse of younger siblings, statements evidencing sadistic and society-hating thoughts, inappropriate forcible touching of others, and "devil worship."

Additionally, the aggravating evidence presented by the prosecution was great. The government sought to prove a probability of future dangerous by presenting evidence that Woods had been involved in the murder of another victim and potentially considered murdering another woman, planned to rob a clothing store, made bombs in the past, and got into a fight with another inmate in the Denton County Jail. The prosecution also presented testimony from the victims' families to demonstrate the impact the murders had on their families, and testimony from a nurse who graphically described the nature of Brosz's

---

would have been mitigating, it also "could certainly be used against [Woods] to prove future dangerousness, since anyone who could get that high and kill two people must certainly be considered a future danger." Adame Aff., Post Conviction Habeas Corpus R. at 572.

[4] In his closing statement during the punishment-determination hearing, Adame stated that Woods was no longer a future danger since he (1) no longer had access to drugs; (2) was incarcerated with no freedom; and (3) was disciplined by the jury when it convicted him of capital murder. Adame argued that the conviction was a turning point and that Woods no longer posed a probability of being a continuing threat.

injuries, including the fact that Brosz's mother saw her "daughter's brains coming out from underneath the dressing . . . ." Trial. Tr. vol. 24, 77, August 19, 2002. Given the great amount of aggravating evidence and the double-edged nature of the neuropsychological evidence, we do not find that Woods has demonstrated that there was a reasonable probability that the outcome would have been different had the evidence been investigated and introduced.

Thus, we cannot find the state trial court's decision not to grant habeas relief for the ineffective-assistance-of-counsel claim objectively unreasonable. Accordingly, habeas relief cannot be granted on this claim.

## B.    Denial of Evidentiary Hearing

Woods argues that the district court erred in denying his motion for an evidentiary hearing because (1) the state court fact-finding process, with its reliance solely on affidavits and trial testimony rather than an evidentiary hearing, was procedurally unreasonable such that it did not comport with minimal due process requirements, and (2) apart from the procedural due process requirements, there are too many unresolved factual conflicts, inconsistencies, and unexamined issues in conflicting affidavits such that the findings and resulting conclusions of law are themselves substantively unreasonable. We disagree.

Under AEDPA, requests for evidentiary hearings are to be evaluated under the provisions of subsection 28 U.S.C. § 2254(e)(2). Where the habeas petitioner has failed to develop the factual basis of his claim due to his lack of diligence, he is only entitled to an evidentiary hearing if the applicant can show (1) that his claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or "a factual predicate that could not have been previously discovered through the exercise of due diligence," and (2) the facts underlying

the claim are "sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2). These exceptions, however, are only applicable when the failure to develop the factual basis is a result of the petitioner's lack of diligence. *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000); *McDonald*, 139 F.3d at 1059. Where the failure to develop the factual basis of the claim in state court is not due to the petitioner's actions, the district court retains discretion over the decision to grant an evidentiary hearing. *Murphy*, 205 F.3d at 815; *McDonald*, 139 F.3d at 1059–60. In such cases, we review a district court's denial of an evidentiary hearing for abuse of discretion. *Murphy*, 205 F.3d at 815.

The government argues that Woods is not entitled to an evidentiary hearing under §2254 (e)(2) because Woods cannot demonstrate he was diligent in his attempt to investigate and pursue his claims in state court. Woods, however, notes that the failure to develop the factual basis of his claims in state court was not his own, but rather the result of the state courts denying him an evidentiary hearing. We agree with Woods, and thus review the district court's denial of an evidentiary hearing for an abuse of discretion.

Both before AEDPA and after, we have consistently held that "when there is a factual dispute which if resolved in the petitioner's favor, would entitle the petitioner to relief and the state has not afforded the petitioner a full and fair hearing, a federal habeas corpus petitioner is entitled to discovery and an evidentiary hearing." *Murphy*, 205 F.3d at 815 (quoting *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996)) (internal quotation and alteration omitted); *see also Moawad v. Anderson*, 143 F.3d 942, 947–48 (5th Cir. 1998)*; Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994). Thus, to find an abuse of discretion that would entitle Woods to an evidentiary hearing, "we must find that the state

did not provide him with a full and fair hearing *and* we must be convinced that if proven true, his allegations would entitle him to relief."[5] *Murphy*, 205 F.3d at 816 (citation omitted) (emphasis added).

Woods argues that the district court should have granted him an evidentiary hearing since the state court fact-finding process was procedurally defective because it relied only on paper records rather than a full trial-like hearing on the factual issues underlying his claim. Woods argues that without "direct testimony by witnesses, subject to cross-examination in order to resolve inconsistencies and ambiguities of their testimony, the state habeas court was not in a position to make reliable determinations of the relevant facts to the claim." He further argues that since the fact-finding procedures were "inherently unreliable," the state courts' conclusions of law were rendered unreasonable. Thus, he argues that the district court's reliance on the state findings of fact and conclusions of law made its decision to deny habeas corpus an unreasonable application of precedent.

We disagree with Woods's assertion that he did not receive a full and fair hearing in the state habeas proceedings. Before and after AEDPA, this Court has "repeatedly found that a paper hearing is sufficient to afford a petitioner a full and fair hearing on the factual issues underlying his claims, *especially where as here, the trial court and the state habeas court were one and the same.*" *Murphy*, 205 F.3d at 816 (citing *Perillo*, 79 F.3d at 446–67 (listing cases where

---

[5] This opinion does not in any way invalidate or modify the precedent set forth in *Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001). In that case, this Court held that a full and fair hearing was not a precondition to according a presumption of correctness to state habeas court findings of fact. *Id.* at 950–51. This precedent still stands. We merely state here that in circumstances not barred by § 2254(e)(2), a defendant is entitled to an evidentiary hearing to determine whether the state court reached an unreasonable determination under § 2254 where (1) the state court proceedings were less than full and fair, and (2) where the defendant has made allegations that would entitle him to relief. Thus, for a finding that a district court abused its discretion in denying an evidentiary hearing, the petitioner must prove both prongs.

presumption of correctness was established with only a paper hearing before the same state judge who presided over the criminal trial)) (emphasis added); *see also Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002).

Here, the state court judge who considered Woods's application for state habeas relief had also served as the trial judge over both the innocence–guilt phase and the punishment phase of Woods's trial.  He was familiar with the parties, counsel, and the evidence presented at trial; thus he was uniquely qualified to make a credibility determination as to the veracity of the trial counsel's affidavits.  Additionally, he and the CCA had the defendant's application, the state's response, and several hundred pages of affidavits, record evidence, and exhibits that had been filed in support and opposition to Woods's claims for review.  Given the state trial judge's familiarity with the parties, their arguments, and the evidence, we cannot say that Woods did not receive a full and fair hearing in the state habeas proceedings.  Thus, we find that the district court did not abuse its discretion  in denying Woods an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court.

AFFIRMED.