# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 12, 2014

Lyle W. Cayce
Clerk

No. 12-70022

JESSIE HOFFMAN,

Petitioner - Appellant

v.

BURL CAIN, WARDEN, LOUISIANA STATE PENITENTIARY,

Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, OWEN, and SOUTHWICK, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Jessie Hoffman was convicted of first-degree murder by a Louisiana jury and sentenced to death. His conviction was upheld by the Louisiana Supreme Court and he was denied state post-conviction relief. The district court denied federal habeas relief, and granted a Certificate of Appealability ("COA"). We AFFIRM the district court's denial of habeas relief.

## I.

### A.

On June 25, 1998, a Louisiana jury convicted Jessie Hoffman of first-degree murder in the death of Mary Elliot. Two days later, the jury found four aggravating circumstances justifying a death sentence: aggravated rape, aggravated kidnapping, armed robbery, and that the offense was committed in

No. 12-70022

an especially heinous, atrocious or cruel manner in that the victim was subjected to torture, physical abuse, or pitiless infliction of unnecessary pain and suffering.[1] On September 11, 1998, the state trial court (hereinafter, "trial court") imposed a sentence of death.

That Hoffman was responsible for the kidnapping, robbery, rape, and death of Elliot is virtually unchallenged. The evidence at trial showed that on the night of November 27, 1996, Hoffman kidnapped Elliot at gunpoint as she left her parking garage in downtown New Orleans after work.[2] He forced Elliot to drive her car to an ATM machine and withdraw around $200 from her account.[3] As the Louisiana Supreme Court noted: "The ATM video tape shows the terror on Ms. Elliot's face as she withdrew money from her account, and Hoffman can be seen standing next to his victim."[4] As his girlfriend would later corroborate, she and Hoffman went shopping afterwards and he paid in cash for several items.[5] Additionally, the State presented DNA and serological evidence linking Hoffman to Elliot.[6]

Hoffman then forced Elliot to drive to a remote area in St. Tammany Parish.[7] Elliot repeatedly begged Hoffman not to hurt her, and he told her he would not because she was cooperating.[8] Elliot "offered herself" while begging for her safety, and Hoffman proceeded to have sexual intercourse with her, all the while still armed with the handgun.[9] Hoffman claimed that the sex was

---

[1] *See* La. Code Crim. Proc. Ann. art. 905.4 (listing the different aggravating circumstances).

[2] *State v. Hoffman*, 768 So. 2d 542, 549–50 (La. 2000).

[3] *Id.* at 550.

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

consensual,[10] but the jury did not believe him, and found aggravated rape as one of the aggravating circumstances supporting its verdict of death.

In his final videotaped confession, Hoffman confessed to kidnapping, robbing, and having sex with Elliot.[11] Hoffman claimed that he shot Elliot during a struggle over the gun at a boat-launch, where the car had pulled over, an assertion the State maintains is a lie and which became the focal point of the trial. Elliot's body was not found by the boat-launch. Rather, it was found approximately 150 feet away at a small, makeshift dock, accessible by land only via a long dirt path, overgrown with vegetation and in an area full of trash.

The prosecutors argued that Hoffman must have known about the dock beforehand, and had planned to kill Elliot there. Under this theory of the case, subsequent to raping Elliot, Hoffman forced her to get out of her car while she was completely nude, and marched her down the dirt path.[12] Hoffman forced Elliot to kneel and then shot her in the head, execution-style.[13] Elliot probably survived for a few minutes after being shot, but Hoffman left her on the dock, completely nude, on a cold November evening.[14] After kidnapping, robbing, raping, and killing Elliot, Hoffman disposed of her belongings and his gun, and returned to work two and a half hours after he had left for his "lunch hour."[15] The State relied in part on this version of facts to argue premeditation which in turn showed specific intent, a necessary prerequisite under Louisiana law for a conviction of first-degree murder.[16]

---

[10] *Id.*

[11] *Id.* at 549.

[12] *Id.* at 550.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *See* La. Rev. Stat. Ann. § 14:30.

No. 12-70022

**B.**

On direct appeal, the Louisiana Supreme Court affirmed Hoffman's conviction and sentence,[17] and denied his application for rehearing.[18] The Supreme Court denied his petition for writ of certiorari.[19] Hoffman then filed a petition for state post-conviction relief on July 20, 2001, and a supplemental petition for post-conviction relief on December 10, 2003. The state post-conviction court (hereinafter, "state court") granted an evidentiary hearing only for the claim made in the supplemental petition that his counsel were ineffective in investigating and presenting mitigating evidence for the penalty phase of the trial. Hoffman also filed a revised supplemental petition in order to correct minor errors on October 20, 2006.

Much of the testimony at the evidentiary hearing upon the ineffective assistance of counsel claim came in by deposition. Hoffman claimed that several pieces of physical evidence previously unavailable to him were made available for his review, and filed requests to test the evidence. After the evidentiary hearing and before any state court decision, on April 17, 2007, Hoffman filed an amendment to his supplemental petition raising three new claims.

The state court denied relief on May 1, 2007, referring *only* to the claims in the revised supplemental petition and offering reasons only for its denial of the ineffective assistance of counsel claim. Hoffman applied for a writ of discretionary review from the Louisiana Supreme Court on October 1, 2007. After initially refusing to accept many of the exhibits in the attached appendix, the Louisiana Supreme Court accepted some. Since this meant that Hoffman's

---

[17] *Hoffman*, 768 So. 2d at 591; *see also State v. Hoffman*, 768 So. 2d 592 (per curiam) (supplementing original opinion).

[18] *Hoffman*, 768 So. 2d at 542.

[19] *Hoffman v. Louisiana*, 531 U.S. 946, 946 (2000).

No. 12-70022

pleadings, including the revised supplemental petition and the amendment, would not be presented to the Louisiana Supreme Court as exhibits, Hoffman filed a supplemental writ application asserting the same claims. On December 12, 2008, the Louisiana Supreme Court denied the writ applications in a summary opinion.[20]

On March 10, 2009, Hoffman timely filed a petition for a writ of habeas corpus in the U.S. District Court for the Eastern District of Louisiana. More than three years later,[21] the district court denied relief and granted a COA. Hoffman timely appeals.

## II.

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and its conclusions of law *de novo*, applying the same standards to the state court's decision as did the district court."[22]

Under 28 U.S.C. § 2254(d), we cannot grant a writ of habeas corpus with respect to any claim adjudicated on the merits in state court unless such adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[23]

---

[20] *State v. Hoffman*, 997 So.2d 554, 554 (La. 2008) ("Denied.").

[21] *Hoffman v. Cain*, No. 09-3041, 2012 WL 1088832, at *1–34 (E.D. La. March 30, 2012).

[22] *Lewis v. Thaler*, 701 F.3d 783, 787 (5th Cir. 2012) (internal quotation marks omitted); *see also Higgins v. Cain*, 720 F.3d 255, 260 (5th Cir. 2013).

[23] 28 U.S.C. § 2254(d).

No. 12-70022

For a challenge to a state court decision under § 2254(d)(1), the Supreme Court has clarified that the "contrary to" inquiry is different from the "unreasonable application" inquiry.[24] A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."[25] A state court's decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."[26] In reviewing a state court's decision under the "unreasonable application" prong, we focus on "the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence."[27] The Supreme Court has clarified that when a claim is adjudicated on the merits, for the purposes of review under § 2254(d)(1), the record is limited to the one before the state court, even if the state court issued a summary affirmance.[28]

A challenge to a state court decision under § 2254(d)(2) challenges the determination of facts by the state court.[29] Under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct" and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[30]

---

[24] *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

[25] *Id.* at 413.

[26] *Id.*

[27] *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (per curiam).

[28] *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398, 1402 (2011).

[29] 28 U.S.C. § 2254(d)(2).

[30] *Id.* § 2254(e)(1).

Section 2254(e)(1) is the "arguably more deferential standard."[31] The Supreme Court has recognized a division among the circuits on the interplay between these two statutory provisions,[32] but has yet to resolve this question.[33] Regardless, a state court's factual determination is "not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."[34] For claims that are not adjudicated on the merits in the state court, we apply a *de novo* standard of review.[35]

Finally, under AEDPA, a habeas petitioner who has failed to develop the factual basis of a claim in state court must show two things to be granted an evidentiary hearing.[36] First, the petitioner has to show either that the claim relies on 1) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or 2) "a factual predicate that could not have been previously discovered through the exercise of due diligence."[37] Second, the petitioner has to show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."[38] Even assuming that a petitioner clears these hurdles, however, we review the district court's denial

---

[31] *Wood v. Allen*, 558 U.S. 290, 301 (2010).

[32] *Id.* at 299 ("[W]e granted review of a question that has divided the Courts of Appeals: whether, in order to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence.")

[33] *Id.* at 300 ("Although we granted certiorari to resolve the question of how §§ 2254(d)(2) and (e)(1) fit together, we find once more that we need not reach this question . . . .").

[34] *Id.* at 301.

[35] *Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. 2006).

[36] 28 U.S.C. § 2254(e)(2).

[37] *Id.* § 2254(e)(2)(A).

[38] *Id.* § 2254(e)(2)(B).

of an evidentiary hearing for an abuse of discretion.[39]

### III.

Hoffman first claims that his counsel were ineffective in the penalty phase of the trial in two respects—that trial counsel failed to properly prepare for the mitigation phase of the trial and that trial counsel failed to properly prepare and present the circumstances of the crime.

### A.

Hoffman's two *Strickland* claims reach us on different procedural footings.

First, the state court rejected the claim that trial counsel failed to properly investigate the mitigating factors for failure of proof as to deficient performance; the federal district court reached the same conclusion and added an additional finding of no prejudice. We thus review the claim of deficient performance under the deferential standard of § 2254 and the finding of no prejudice *de novo*.

Second, the state court did not expressly address the claim that trial counsel were ineffective in investigating and presenting evidence that supported their theory of the crime, a claim that was presented in the amendment to the supplemental petition. The state court did not mention *any* of the claims in the amendment when denying relief. The initial question is whether this claim was adjudicated on the merits, triggering § 2254(d) deference.[40]

---

[39] *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000); *see also Morris v. Thaler*, 425 F. App'x 415, 422 (5th Cir. 2011); *Woods v. Thaler*, 399 F. App'x 884, 898 (5th Cir. 2010).

[40] While Hoffman's application to the Louisiana Supreme Court for a writ of review was denied, this is not necessarily a denial on the merits of its legal questions. *State v. Fontenot*, 550 So. 2d 179, 179 (La. 1989); *see also Alex v. Rayne Concrete Serv.*, 951 So. 2d 138, 145 n.6 (La. 2007).

In *Harrington v. Richter*,[41] a defendant petitioned the California Supreme Court for a writ of habeas corpus.[42] The California Supreme Court denied the petition in a "one-sentence summary order."[43] Even though no explanation accompanied the decision, the Supreme Court held that § 2254(d) still applied.[44] "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."[45] The Supreme Court did allow that the "presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."[46] More recently, in *Johnson v. Williams*,[47] the habeas petitioner raised a federal claim and the "state court rule[d] against the defendant and issue[d] an opinion that addresse[d] some issues but d[id] not expressly address the federal claim in question."[48] The Court applied the *Richter* presumption,[49] explaining that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted."[50] According to the Court, the presumption that a federal claim was adjudicated on the merits could be rebutted "either by the

[41] 131 S. Ct. 770 (2011).
[42] *Id.* at 783.
[43] *Id.*
[44] *Id.* at 784.
[45] *Id.* at 784–85.
[46] *Id.* at 785.
[47] 133 S. Ct. 1088 (2013).
[48] *Id.* at 1091.
[49] *Id.* at 1094 ("Although *Richter* itself concerned a state-court order that did not address *any* of the defendant's claims, we see no reason why the *Richter* presumption should not also apply when a state-court opinion addresses some but not all of a defendant's claims.").
[50] *Id.* at 1096.

No. 12-70022

habeas petitioner (for the purpose of showing that the claim should be considered by the federal court *de novo*) or by the State (for the purpose of showing that the federal claim should be regarded as procedurally defaulted)."[51] For example, "a federal claim [that] is rejected as a result of sheer inadvertence," would not be afforded the *Richter* presumption.[52]

Here, the parties fail to rebut the *Richter* presumption. Although both parties treat the claim as not having been adjudicated on the merits, neither party briefs the *Richter* presumption.[53] As the Court has made clear, the parties bear the burden of rebutting the presumption.[54] Given these considerations, we apply the *Richter* presumption here, assuming that the claim was adjudicated on the merits and giving the deference ordered by § 2254(d).[55]

## B.

The metric is now rote. Under *Strickland v. Washington*,[56] a successful ineffective assistance of counsel claim must satisfy two distinct prongs:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors

---

[51] *Id.*

[52] *Id.* at 1097.

[53] It must be noted that *Johnson v. Williams* was a Supreme Court decision that was issued on February 20, 2013. The State, however, submitted its appellate brief on February 5, 2013. Hoffman filed his reply brief on February 22, 2013. He clearly cites to *Williams* in his reply brief.

[54] *Williams*, 133 S. Ct. at 1096.

[55] Given the *Richter* presumption, an evidentiary hearing on this claim is not allowed for the § 2254(d) inquiry and the district court did not err in not granting a hearing on this claim.

[56] 466 U.S. 668 (1984).

No. 12-70022

were so serious as to deprive the defendant of a fair
trial, a trial whose result is reliable.[57]

To satisfy the deficient performance prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness."[58] "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."[59] While "[p]revailing norms of practice," such as the American Bar Association standards, can be used as guides to determine what is reasonable, they are only guides and do not constitute definite checklists.[60] Judicial scrutiny of performance has to be "highly deferential."[61] To avoid the "distorting effects of hindsight,"[62] conduct must be evaluated "on the facts of the particular case, viewed as of the time of counsel's conduct."[63] There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[64] These same standards govern counsel's duty to investigate.[65] "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[66] Thus, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[67] Such reasonableness can be assessed by taking into account the defendant's own statements, actions, and information

---

[57] *Id.* at 687.
[58] *Id.* at 688.
[59] *Id.*
[60] *Id.*
[61] *Id.* at 689.
[62] *Id.*
[63] *Id.* at 690.
[64] *Id.* at 689.
[65] *Id.* at 690.
[66] *Id.* at 691.
[67] *Id.*

supplied by the defendant;[68] whether counsel has "reason to believe that pursuing certain investigations would be fruitless or even harmful";[69] resource constraints;[70] and whether the information that might be discovered would be of only collateral significance.[71]

To satisfy the prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[72] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[73] The "reasonable probability" standard is less demanding than a "more likely than not" standard, and the defendant does not need to "show that counsel's deficient conduct more likely than not altered the outcome in the case."[74] "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[75] Similarly, when the defendant challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer— including an appellate court, to the extent it independently reweigh[ed] the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[76] We must consider the totality of the evidence before the decision maker.[77]

---

[68] *Id.*

[69] *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 525 (2003); *Williams*, 529 U.S. at 395; *Burger v. Kemp*, 483 U.S. 776, 794 (1987).

[70] *See Richter*, 131 S. Ct. at 789.

[71] *See Rompilla v. Beard*, 545 U.S. 374, 389 (2005); *id.* at 394 (O'Connor, J., concurring).

[72] *Strickland*, 466 U.S. at 694.

[73] *Id.*

[74] *Id.* at 693.

[75] *Id.* at 695.

[76] *Id.*

[77] *Id.* at 695–96.

No. 12-70022

## C.

"The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."[78] The Supreme Court has explained:

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.[79]

Thus, while "[s]urmounting *Strickland*'s high bar is never an easy task," "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult."[80] Both the *Strickland* standard and the AEDPA standard are "highly deferential" and "when the two apply in tandem, review is doubly so."[81]

## D.

Hoffman argues that the state court's determination that there was no deficient performance in investigating mitigating factors was based on an unreasonable determination of facts. The Supreme Court has recognized the circuit division over the relationship between § 2254(d)(2) and § 2254(e)(1), but

---

[78] *Richter*, 131 S. Ct. at 785.
[79] *Id.* (citation omitted).
[80] *Id.* at 788 (internal quotation marks omitted).
[81] *Id.* (internal quotation marks omitted).

has declined to resolve it.[82] The Supreme Court has indicated that while § 2254(e)(1) "pertains only to state-court determinations of factual issues, rather than decisions," § 2254(d)(2) "contains the unreasonable requirement and applies to the granting of habeas relief" itself.[83]

We have held that § 2254(e)(1) "pertains only to a state court's determinations of particular factual issues, while § 2254(d)(2) pertains to the state court's decision as a whole."[84] In other words:

> Whereas § 2254(d)(2) sets out a general standard by which the district court evaluates a state court's specific findings of fact, § 2254(e)(1) states what an applicant will have to show for the district court to reject a state court's determination of factual issues. For example, a district court may find by clear and convincing evidence that the state court erred with respect to a particular finding of fact, thus rebutting the presumption of correctness with respect to that fact. *See* § 2254(e)(1). It is then a separate question whether the state court's *determination* of facts was unreasonable in light of the evidence presented in the state court proceeding. *See* § 2254(d)(2). Thus, it is possible that, while the state court erred with respect to one factual finding under § 2254(e)(1), its determination of facts resulting in its decision in the case was reasonable under § 2254(d)(2).[85]

Thus, for Hoffman to succeed in showing that the state court's determination of facts was unreasonable, he will have to do more than simply

---

[82] *Wood*, 558 U.S. at 300–01 (noting that the circuits are split on this question, but finding it unnecessary to resolve it because the state court's finding that trial counsel made a strategic decision was not unreasonable even under § 2254(d)(2)).

[83] *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 341–42 (2003).

[84] *Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011) (citing *Miller-El I*, 537 U.S. at 341–42).

[85] *Fields v. Thaler*, 588 F.3d 270, 279 (5th Cir. 2009) (quoting *Valdez v. Cockrell*, 274 F.3d 941, 951 n.17 (5th Cir. 2001)).

show the erroneous nature of one individual fact-finding.

Hoffman takes issue with four findings of fact by the state court: (i) the state court's finding that trial counsel "followed the American Bar Associations guidelines"; (ii) that trial counsel interviewed Marvin Fields, Hoffman's brother, and Joann Norman, his aunt-by-marriage; (iii) that Dr. Elaine Salzer "concluded that [Hoffman] suffered from no psychosis or mental deficiencies"; and (iv) that trial counsel were "certified in accordance with the state rules to represent persons charged with capital offenses."

As for the ABA Guidelines, Hoffman has failed to rebut the relevant fact-finding by clear and convincing evidence. Hoffman points primarily to the testimony of his expert Michele Fournet. Fournet testified to the content of the ABA Guidelines, and indicated that in her opinion trial counsel had failed to meet the ABA Guidelines as a whole. For example, Hoffman asserts that Fournet's testimony proves that trial counsel did not follow Guideline 11.8.6.[86] But when Fournet was asked whether trial counsel had followed certain other Guidelines, she either acknowledged that trial counsel did follow those Guidelines or that she did not know if trial counsel had fulfilled them. For example, she acknowledged that she did not know whether trial counsel had fulfilled Guideline 11.4.1(2) and testified that trial counsel had fulfilled Guideline 11.4.1(2)(A).

Hoffman also points to the fact that J. Kevin McNary, Hoffman's second-chair counsel, testified that he had never heard of the ABA Guidelines at the time of the trial. But this is not proof that trial counsel's work did not meet its standards. For one thing, the ABA Guidelines and the state certification standards cover much of the same ground, and both counsel were properly

---

[86] *See* Am. Bar Ass'n, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6 (1989).

certified. Hoffman has not here overcome the presumption of correctness by clear and convincing evidence.

Next, Hoffman disputes the state court's finding that trial counsel interviewed Marvin Fields, Hoffman's brother, and Joann Norman, his aunt-by-marriage. He points out that neither William Alford, Hoffman's lead counsel, nor McNary claimed to have spoken to them, and both Fields and Norman testified that they were not interviewed by trial counsel. The district court correctly recognized that the state court fact-finding was erroneous on this point. But this is not enough to support a holding by this Court that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The district court was correct in finding that this individual fact was not so important as to undermine the state court's fact-finding on the whole.

Hoffman also disputes the state court's finding that Dr. Elaine Salzer "concluded that [Hoffman] suffered from no psychosis or mental deficiencies." Dr. Salzer, a psychologist retained by Alford and McNary to evaluate Hoffman, testified at the trial. Hoffman argues that Dr. Salzer only concluded that "the available data" "fails to support a diagnosis of major psychopathology." In other words, Hoffman's attack is that Dr. Salzer did not affirmatively find that Hoffman suffered no major psychopathology, but only found that there was insufficient evidence to make a diagnosis. But Dr. Salzer did not find that Hoffman suffered from mental illness, and the state court was correct in so concluding.

Finally, Hoffman argues that the state court unreasonably relied on its finding that trial counsel were "certified in accordance with the state rules to represent persons charged with capital offenses." Hoffman accepts that both counsel were certified but argues that the inquiry ought to be whether the lawyers adhered to the state certification requirement, not whether they were

certified in the first place. We need not disagree with this accent to conclude that the state court did not on balance give this fact undue weight.

### E.

Turning to the state court's determination that there was no deficient performance in investigating mitigating factors, Hoffman argues that it is contrary to and involves an unreasonable application of clearly established federal law. Hoffman argues that trial counsel's performance was deficient, and that they failed to discover all reasonably available mitigating evidence and did not follow prevailing standards of capital defense.

To the point, Hoffman contends that trial counsel failed in collecting his medical history, mental and physical, and family and social history, including physical, sexual, and emotional abuse. Hoffman also faults trial counsel's failure to use a mitigation specialist. He argues that counsel's reliance on limited information from Hoffman himself was not enough; that counsel's contact with lay witnesses was not sufficient; and that counsel should have interviewed his mother and brothers, at a minimum. But evidence from the state post-conviction proceedings shows that counsel interviewed Hoffman and his girlfriend, conferred with several family members, including Hoffman's father, and interviewed other potential witnesses by telephone. While counsel did not speak to one witness until trial, they interviewed most of the witnesses earlier. It is true that counsel did not speak to Hoffman's mother or brother, but there were reasons given for the mother's lack of involvement. Hoffman's contention that counsel relied too extensively on information that he provided himself does not persuade and is in tension with the Supreme Court's observation that the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."[87] As

---

[87] *Strickland*, 466 U.S. at 691.

our sister circuit has recognized, there is no "per se rule that trial counsel is ineffective at mitigation unless a particular type of expert is retained."[88]

Hoffman further contends that trial counsel only subpoenaed Hoffman's school records, but no other records, and that trial counsel did not collect medical and mental health records that would have shown Hoffman's "failure to thrive," his mother's erratic and violent behavior, his paternal grandmother's problems, and the family history of psychosis and mental illness. Similarly, Hoffman contends that other public records would have shown more disturbing family history, including records of 911 calls, proof of substandard housing, reports of the murder of 10 family members, records of domestic violence within the family, and a police report of an armed robbery in which Hoffman was a victim. That might well be true but trial counsel did collect information about Hoffman's education, sports activities, employment, and prior criminal record. In that information, they found no indication that Hoffman suffered from more serious problems or that fruitful paths were yet to be followed. We cannot find error in the state court's finding that counsel's failure to seek more records was not deficient.

Hoffman also urges that the retained psychologist, Dr. Salzer, did not compile a psychosocial history, was not qualified to administer neuropsychological testing or conduct psychiatric testing, did not interview any other witnesses besides Hoffman, and did not review any records besides Hoffman's school records. Dr. Salzer's failure to compile a history ought not surprise: trial counsel specifically told Dr. Salzer not to issue a written report. According to Dr. Salzer, Hoffman had an atypical profile for such a crime, in that there was no evidence of early childhood conduct disorder, such as defiance, truancy, theft, or fire setting. Instead, Hoffman had passing grades

---

[88] *Carter v. Mitchell*, 443 F.3d 517, 527 (6th Cir. 2006).

in high school and leadership experience—he was the quarterback and captain of the football team, had worked since the age of 15, and was a camp counselor for a church summer camp. Dr. Salzer's testing of Hoffman did not disclose any sociopathy, aggression, or violence, and Hoffman related a positive view of his mother and father. In short, there was no showing that Dr. Salzer ought to have nonetheless been alerted to pursue further his mental health history or family background.

In addition to Dr. Salzer, two other mental health experts appointed by the trial court also examined Hoffman prior to trial: Dr. Rafael Salcedo and Dr. John Paul Pratt. Dr. Salcedo testified at the state post-conviction hearing that his task "consisted of determining whether Mr. Hoffman at the time of the examination was suffering from a psychiatric disorder" and whether he was competent to stand trial. The results of his examination was that Hoffman was not suffering from any diagnosable mental disorder or any major psychopathology. Dr. Pratt also testified in state post-conviction proceedings that Hoffman had no psychiatric symptoms before trial. Hoffman presented three post-conviction mental health experts as evidence of ineffective assistance of counsel. However, both Dr. Salcedo and Dr. Pratt testified at the post-conviction hearing that they disagreed with the post-conviction experts' analysis. For example, Dr. Salcedo disagreed with Hoffman's post-conviction experts and stated that there was no evidence of schizophrenia at the time of the trial. Moreover, he disputed the availability of brain imaging at the time of the trial—thus challenging an argument of Hoffman's post-conviction experts. Similarly, Dr. Pratt also disputed the availability of brain imaging that Hoffman's post-conviction experts relied on. Given these conflicting testimonies, the state court's decision did not violate the strictures of § 2254.

Hoffman also contends that the state court erred in dismissing the credibility of much of the mitigating evidence as unsubstantiated hearsay and

irrelevant. But the state court ruled that trial counsel's performance was not deficient, never reaching the issue of prejudice.

Finally, Hoffman argues that lead counsel did not make a strategic decision and admitted that his investigation was insufficient, and that trial counsel did not affirmatively pursue a mitigation case, simply relying upon a plea for mercy. Trial counsel's sought-for narrative was that Hoffman was a "good kid" who had a "bad day" and that the situation got out of hand. Hoffman argues that this strategy backfired when the prosecutor spun it in support of the death penalty. Lead counsel Alford testified at the post-conviction hearing that while he would have introduced evidence of Hoffman's mental health and family background at trial, he doubted the effectiveness of such evidence. Counsel seems to have made a strategic choice here, opting for two strategies at trial: contesting the accidental nature of the murder and utilizing the "good kid, bad day" narrative.

By the metric of our review, we cannot here fault the state court's adjudication. As we have observed, the state court found that trial counsel followed the ABA Guidelines, a state fact-finding that binds our review. This compliance weighs in favor of counsel's performance. Both counsel were certified to handle capital cases and had experience in representing capital defendants. Given the lack of notice that counsel had about Hoffman's mental health history and about his family background, the state court's decision that there was no deficient performance, and no *Strickland* error, was neither contrary to nor an unreasonable application of clearly established federal law. The district court committed no error.

## F.

Hoffman contends that trial counsel were also deficient because they did not adequately investigate and present the circumstances of the crime to support his theory at trial. He contends that this prejudiced him during the

penalty phase of the trial because the jury had already lost faith in trial counsel and because the jury's understanding of the circumstances of the crime was adversely impacted.

Recall that, Hoffman stated that he had shot Elliot during a struggle at the boat-launch, leaving unexplained the discovery of her body by a wooden dock, which was approximately 150 feet downstream from the boat-launch and accessible by land only via a long, dirt path. As a result, the State argued that Hoffman lied in his confession. According to the State, Hoffman must have known about the dock beforehand, had planned to kill Elliot there, and forced her to march down there before shooting her execution-style.

Trial counsel argued that Hoffman was truthful in his confession, and that the shooting did happen at the boat-launch, but that the body floated downriver to the dock. The State countered in several ways: it provided testimony that the tide did not reach the body, it argued that the blood spatter on the dock proved Elliot was shot there, it showed photographs of the path and had witnesses describe it, and it took the jurors to the scene to see and march the path themselves.

Hoffman now contends that his trial counsel's performance was deficient because they should have done more. He argues that counsel made no strategic decisions of how to best present the circumstances of the case. He points to the fact that during their post-conviction deposition, trial counsel admitted that they did not have "a truly coherent plan" for the guilt phase, and they were hoping that the State would make some kind of mistake. For example, he finds fault with the fact that trial counsel did not use an office investigator or a forensic expert; did not interview witnesses; and did not use the report of the first responding deputy, who described the water levels and the tides.

Hoffman also claims that what trial counsel did do was insufficient. For example, trial counsel tried to argue that Elliot could not have walked down

the path because her feet were not cut, but the State ridiculed this argument. Similarly, trial counsel tried to show that the body did float down to the dock by eliciting testimony during cross-examination, but they only got unhelpful testimony. Finally, trial counsel tried to show that the body must have floated down to the dock by trying to demonstrate that there was no lividity and limited rigor mortis in the body when it was found. However, trial counsel only used the cross-examination of the coroner to prove this, and the coroner testified that the lividity had changed by the time of the autopsy, meaning that he could not testify one way or another as to the lividity of the body when it was found.

Hoffman further contends that the jury did not review several dispositive pieces of information. First, they did not hear that the tide data and evidence from a post-conviction pathologist, geologist, and crime scene reconstruction expert support Hoffman's version of events. Second, they did not hear evidence that the scrapes on Elliot's knees were consistent with her body scraping the jagged riverbed as she floated, thus countering the State's theory that her knees were scraped because she was kneeling during the execution-style shooting. Third, they did not hear evidence that the bullet path did not demonstrate an execution-style killing. Fourth, they did not hear that Hoffman was carrying a gun with him because he lived in an area where he had lost family members and had suffered from three violent attacks in the months preceding the crime.

Even on these facts, we cannot conclude that the state court was unreasonable in rejecting this claim. Trial counsel did conduct an investigation into the circumstances of the crime. Alford testified that he tracked the crime scene, starting in New Orleans to the end point. McNary testified that he hired a DNA expert to review the relevant tests. There is no checklist to assess trial

counsel's performance and no list of necessary expert testimony.[89] Rather, the question is whether the investigation was reasonable and whether decisions not to investigate were reasonable.[90] Trial counsel made a reasonable decision not to investigate further, and chose a strategy of discrediting the State's theory of the case.

Hoffman has again not shown deficient performance. In deciding that no *Strickland* error occurred, the state court decision was neither contrary to nor an unreasonable application of clearly established federal law. The district court committed no error in rejecting this claim.

## G.

We thus do not need to reach the issue of prejudice.

## IV.

Hoffman next brings a *Brady* challenge, claiming that the State suppressed favorable evidence that would have been exculpatory. This claim was also raised for the first time in Hoffman's amendment to the supplemental petition. The state court order denying relief never mentioned this claim. Applying the *Richter* presumption as we must,[91] we conduct our review under the deference ordered by § 2254.

Under *Brady v. Maryland*,[92] a habeas petitioner must show three components to prevail: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and

---

[89] *Strickland*, 466 U.S. at 688.

[90] *Id.* at 691.

[91] *See supra* Part III(A) (explaining why the *Richter* presumption is proper for the claims brought in the amendment to the supplemental petition, and resultantly, why an evidentiary hearing was not warranted for the § 2254 analysis).

[92] 373 U.S. 83 (1963).

prejudiced must have ensued."[93]

Hoffman argues that the state suppressed a coroner's investigator's report, which documented a lack of lividity and limited rigor mortis in Elliot's body at the scene of the crime.

According to Hoffman's post-conviction pathologist, this lack of lividity and limited rigor mortis indicated that the body had not been lying in the position in which it was found; rather, it indicated that the body was moving, which would be consistent with the theory that the body floated down the water from the boat-launch to the dock. The district court found, and we agree, that the suppressed evidence was neither favorable nor material. In terms of materiality, Hoffman argues that the *Brady* error prejudiced his sentencing. In this narrow and limited posture, we cannot conclude that the state court was unreasonable in its finding of no prejudice in the penalty phase because there were other aggravating circumstances. The district court committed no error.

## V.

Hoffman next brings a claim of discrimination in selecting a grand jury foreperson. As we will explain, this claim is procedurally barred and thus presents no claimed error of federal law.

Hoffman moved to quash the indictment returned against him in this case by a St. Tammany Parish grand jury based on allegations of racial discrimination in the selection of the grand jury foreperson. The trial court denied the motion without oral or written reasons.

According to Hoffman, he brought his claim of discrimination in the selection of the grand jury foreperson once again in state post-conviction proceedings and the state court denied it on the merits. The State replies that

---

[93] *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

the state court held the claim to be procedurally barred in the May 1st order. The state court order does have suggestions of a merits decision, but it also explicitly references an earlier post-conviction hearing by the state court. At the earlier hearing, the state court found that Hoffman filed his motion to quash and then abandoned it; that when the trial court marked the motion satisfied it meant that Hoffman was not going to pursue the motion and therefore the claim would not be considered in post-conviction proceedings. In sum, the state court found that this claim of discrimination in selecting a grand jury foreperson was abandoned by Hoffman before trial and was procedurally barred. The State urges that this is as an independent and adequate state law decision which presents no clear error of federal law.

"Out of respect for finality, comity, and the orderly administration of justice, a federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default."[94] The narrow exception is when the petitioner "can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense or, in the capital sentencing context, of the aggravating circumstances rendering the inmate eligible for the death penalty."[95] To determine whether the state court denied relief based on an adequate and independent state procedural rule, we examine the last reasoned state court decision to see whether it applies a procedural bar or addresses the merits of the claim.[96] We agree with the district court's determination that the record shows that the state court found the motion to be abandoned and procedurally barred; that this claim is procedurally defaulted; and that as Hoffman does not meet the narrow

---

[94] *Dretke v. Haley,* 541 U.S. 386, 388 (2004).

[95] *Id.*

[96] *Ylst v. Nunnemaker,* 501 U.S. 797, 803 (1991).

No. 12-70022

exception to such default, we cannot review its merits.

## VI.

Hoffman also claims that the district court erred in denying his *Batson* challenge. The State used its preemptory challenges to strike two of the three prospective jurors from the venire who were African-American, Mr. Galatas and Ms. Malter, and successfully challenged the other African-American prospective juror for cause.

## A.

The trial court rejected this claim.[97] On direct appeal, the Louisiana Supreme Court affirmed.[98] The state court in turn rejected this claim on the merits. We give the deference ordered by § 2254.

Under *Batson v. Kentucky*,[99] a claim works in three steps. The defendant first must make a *prima facie* showing that the prosecutor exercised a preemptory strike on the basis of race.[100] Next, the burden shifts to the prosecutor to provide a race-neutral explanation for the challenged strike and rebut the *prima facie* case.[101] Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.[102]

A state trial court's finding of the absence of discriminatory intent is a pure issue of fact and is accorded great deference; it will not be overturned unless clearly erroneous.[103] Therefore, the federal court's role is to "determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear

---

[97] *Hoffman*, 768 So. 2d at 556–57.

[98] *Id.* at 560.

[99] 476 U.S. 79 (1986).

[100] *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005).

[101] *Id.*

[102] *Id.*

[103] *Id.*

26

and convincing evidence to the contrary."[104]

### B.

With respect to Mr. Galatas, the prosecution offered a race-neutral explanation for the strike: Galatas was hesitant about his willingness to impose the death penalty. The prosecution directed the trial judge to two responses: 1) In individual voir dire, when asked if he could consider the death penalty, Galatas hesitated and said "I think I could," but when asked if he could consider life, he said "I could." 2) In full-panel voir dire, Galatas "hesitated and gave a very weak 'I think I could'" when asked if he could consider death, and his response was soft such that the District Attorney had to ask him to repeat it. When the defense disputed these reasons, the prosecution also offered another reason: that it had struck five white jurors who were similarly situated on the death penalty. The trial court accepted these race-neutral reasons, including that "similar[] preemptory challenges were exercised by the State" against white prospective jurors. On appeal, the Louisiana Supreme Court affirmed accepting all three reasons.[105] According to the Louisiana Supreme Court, while certain portions of the voir dire tended to support Hoffman's contentions, the voir dire in totality did not support his *Batson* challenge as to Galatas.[106] Specifically, the Louisiana Supreme Court found that Galatas clearly waivered when questioned about his stance on the death penalty.[107] In contrast, the Louisiana Supreme Court found that Galatas answered "affirmatively without equivocation" when asked about life imprisonment.[108] Similarly, the Louisiana Supreme Court also rejected

---

[104] *Id.* (quoting *Miller-El I*, 537 U.S. at 341).

[105] *Hoffman*, 768 So. 2d at 557–59.

[106] *Id.*

[107] *Id.* at 558.

[108] *Id.*

Hoffman's contention that Galatas was subject to disparate questioning.[109] Finally, the Louisiana Supreme Court found that similarly situated white jurors had also been struck by the State.[110] The record supports these findings, and they are not clearly erroneous. Hoffman contends that the Louisiana Supreme Court erred in conducting its own *Batson* analysis, that the trial judge relied only on the race-neutral reason that similarly situated white jurors had been struck, and that the Louisiana Supreme Court did not defer to this trial court finding. We are not persuaded. It is not clear from the record that the trial judge solely relied on that one race-neutral reason, and we give AEDPA deference to fact-findings made by a state appellate court.[111]

With respect to Ms. Malter, the prosecution offered race-neutral explanations for the strike as well: that Malter had rated herself as a 1 out of 10 when asked by the prosecution to rate herself on the decisiveness scale, and that Malter looked Hoffman in the eye and smiled when answering that she could give him a fair trial. The trial court accepted this explanation noting that "the State has presented a sufficiently racially neutral reason for use of its preemptory challenge." The Louisiana Supreme Court affirmed, concluding that while Hoffman was correct that Malter actually rated herself a 5 out of 10, and not a 1 out of 10, two different prosecutors used two different "decisiveness" scales.[112] On the one hand, District Attorney Reed defined the scale in such a way that he wanted people in the middle of the scale.[113] On the other hand, Assistant District Attorney Gracianette defined the scale in such a way that he wanted people at the high end of the scale.[114] Malter was asked

---

[109] *Id.*

[110] *Id.* at 559.

[111] *See Moody v. Quarterman*, 476 F.3d 260, 268–72 (5th Cir. 2007).

[112] *Hoffman*, 768 So. 2d at 559–60.

[113] *Id.* at 559.

[114] *Id.*

to rate herself by Assistant District Attorney Gracianette, and not District Attorney Reed.[115] Therefore, the Louisiana Supreme Court concluded that striking Malter was consistent with the use of the decisiveness scale, even though the trial court incorrectly held that Malter was 1 on the scale, and affirmed while also pointing to the body language cited by the prosecutors.[116] The record supports these findings, and they are not clearly erroneous.

Hoffman also claims repeatedly that the venue chosen by the State in which to prosecute Hoffman demonstrates purposeful discrimination as to both Galatas and Malter. We do not find this contention persuasive.

The preemptory strikes were race-neutral, and the state court did not violate the strictures of § 2254 in refusing to overturn the previous rulings on this *Batson* challenge. For these reasons, the district court did not err in holding that Hoffman had not provided clear and convincing evidence that the state court's determination was unreasonable.

## VII.

Hoffman also claims that both the state court and the district court erred in denying his claim of racial discrimination by the petit jury. Hoffman attempted to produce evidence of the jury's racial discrimination during the state post-conviction proceedings. He attached an alleged affidavit from one of the jurors, Mari Lower, which he claims demonstrates the racial bias held by the jury.

### A.

This claim was originally presented to the state court. The state court adjudicated this claim on the merits and denied it. The deferential lens of § 2254 still applies. The district court did not address the § 2254 issue, but

---

[115] *Id.*

[116] *Id.* at 559–60.

denied this claim on an evidentiary basis, holding that the affidavit would not have been admissible in any case because of Federal Rule of Evidence 606(b).

**B.**

The district court denied this claim on Federal Rule of Evidence 606(b) grounds. However, the first inquiry is whether the state court was unreasonable in rejecting this claim in the post-conviction setting. Upon close examination, we determine that it was not.

First, the Louisiana Code of Evidence has a rule similar to Rule 606(b) that prevents the impeachment of verdicts via juror testimony:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.[117]

The state court could have easily decided that this juror affidavit fell within this jury shield provision. Deciding so would not be contrary to or involve an unreasonable application of federal law, because the Supreme Court has clarified that the jury shield provision is a strong evidentiary bar. In *Tanner v.*

---

[117] La. Code Evid. Ann. art. 606(b).

No. 12-70022

*United States*,[118] there were allegations that many jurors had consumed alcohol and drugs during their lunch breaks, which caused them to sleep during the afternoon session of the trial and might have affected their reasoning capabilities.[119] The Court recognized that an exception existed in which juror testimony could be taken as to "extraneous influence."[120] However, the Court held that juror intoxication did not fit within the exception for "outside influence[s]," but was rather an internal issue.[121] The Court held that the district court did not err in not holding an evidentiary hearing.[122] As a result, it would have been entirely proper for the state court to have decided this case on these grounds.

Hoffman contends that Louisiana's Article 606(b) has an exception for constitutional challenges. Indeed, the Louisiana Supreme Court has held that Article 606(b) is flexible and can yield when there is a constitutional challenge.[123] However, it does not follow that the state court was in error. The evidentiary bar aside, the state court could have concluded that the evidence did not support a finding of intentional bias or discrimination. And again this fact-finding is due heightened deference under § 2254. In examining the affidavit, the state court cannot be said to have been unreasonable or contrary to federal law in deciding that no bias or discrimination was shown. The affidavit presents juror speculation, and, more importantly, affirms that the jury acted on the basis of the evidence and the jury instructions.

Finally, Hoffman invokes the general juror misconduct standard. Even

---

[118] 483 U.S. 107 (1987).

[119] *Id.* at 113–16.

[120] *Id.* at 117–21.

[121] *Id.* at 122–27.

[122] *Id.*

[123] *State v. Graham*, 422 So. 2d 123, 131 (La. 1982); *State v. Johnson*, 796 So. 2d 201, 210 (La. Ct. App. 2d Cir. 2001).

No. 12-70022

assuming the state court did not rely on the evidentiary bar, the state court was not in error. On collateral review, "habeas petitioners are not entitled to relief based on a constitutional error unless the error had [a] substantial and injurious effect or influence in determining the jury's verdict."[124] Hoffman does not meet this high standard because, again, the affidavit indicates that the jury acted on the basis of the evidence and the jury instructions. As a result, Hoffman's claim of racial discrimination by the jury must fail. The district court was correct in rejecting this claim.

## VIII.

We AFFIRM the district court's denial of habeas relief.

---

[124] *Oliver v. Quarterman*, 541 F.3d 329, 341 (5th Cir. 2008) (internal quotation marks omitted); *see also Kotteakos v. United States*, 328 U.S. 750, 776 (1946).